**UNITED STATES, Appellee,**

v.

**Charles POWELL, Defendant, Appellant.**

**No. 94–1487.**

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 1995.

Decided March 29, 1995.

---

Elizabeth A. Lunt, with whom Zalkind, Rodriguez, Lunt & Duncan, Boston, MA, were on brief, for appellant.

Ralph F. Boyd, Jr., Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., and Kevin J. Cloherty, Asst. U.S. Atty., Boston, MA, were on brief, for appellee.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

Following a five-day jury trial, defendant-appellant Charles Powell was convicted of being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). He was then sentenced to the statutory maximum of 120 months' imprisonment. Powell challenges his conviction and sentence on a variety of grounds. After carefully reading the record and considering Powell's arguments, we affirm.

## I.

### A.  General Background

At shortly after 2:00 p.m. on October 7, 1992, Powell was standing outside of his truck. He was holding food and conversing with Arvetta Boykins—his girlfriend—and Boykins' mother as the two women sat in the truck. The truck was parked on Boston's Humboldt Avenue near its intersection with Ruthven Street and across from Humboldt Liquors. As this conversation was taking place, a grayish-silver Subaru drove slowly down Ruthven and turned onto Humboldt. There were four young men in the Subaru, each of whom was wearing a hooded sweatshirt with the hood pulled up.

As the Subaru proceeded down Humboldt, the men in the car yelled something to a couple of young men—Chris Cheney and Er-

nest Rhodes—who were standing out on Humboldt. Either Rhodes or Cheney yelled back. After this exchange, the driver of the Subaru put the car in reverse and accelerated quickly, making a loud screeching sound. Observing this, Powell handed his food to his girlfriend's mother and told the two women to "get out of here." Knowing that trouble was brewing, they quickly complied by driving off. Powell then ran up Ruthven.

By about 2:30 p.m., Powell had returned to Humboldt Avenue and was talking with Cheney and Rhodes in front of Humboldt Liquors. Around this same time, Stanley Owens came around the corner of Ruthven and Humboldt on a mountain bike. He had his hand in his jacket pocket and was leaning to his left. At least one other youth also came on the scene simultaneously. At some point, gunfire erupted. The gunfire, which came from at least three guns, was continuous and lasted six or more seconds. Three persons, including Powell, were wounded in the shootout; Owens was killed. Cheney and Rhodes escaped injury by taking cover inside of Humboldt Liquors. Within an hour of the shooting, Powell was arrested. At the time of his arrest, Powell was standing in an alley not far from the intersection of Ruthven and Humboldt, and was holding a .44 Charter Arms Bulldog handgun. He also had a walking cane with him. It was subsequently determined that a bullet from the .44 had killed Owens. Powell does not dispute that he fired two shots with the .44 during the shootout.

### B. The Necessity Defense

At trial, the government argued that Powell shot Owens with a gun he had brought to the crime scene. Powell consistently denied this, asserting as an affirmative defense that he took possession of the .44 only out of necessity in the midst of the shoot-out. When he was in an ambulance after the shooting, Powell told an arresting officer that the youths in the gray Subaru had started shooting from the car, that a light-skinned black male had alighted and continued the shooting, that he (Powell) ran towards this shooter, and that the shooter then lost control of the weapon, dropped it to the ground,

and jumped back into the Subaru, which sped off. Powell stated that he picked up the gun and ran to the alley in which he was arrested. He did not mention firing the weapon at anyone.

To clarify how the shooter lost control of the weapon, the officer asked Powell to repeat his story. At this point, Powell told the officer that the light-skinned male got out of the Subaru, began the shooting, and fled on foot. He did not mention the shooter dropping or losing control of his weapon. When the officer asked how the weapon ended upon the ground, Powell did not answer.

At trial, Powell had a third account of what had happened. Powell testified that he heard shots ring out as he stood in front of Humboldt Liquors talking with Cheney and Rhodes. While Cheney and Rhodes sought refuge inside the store, Powell began running up the street towards the intersection of Humboldt and Ruthven. Just then, a man who was pulling a gun out of his pocket came running around the corner. The man pointed the gun at him, but was unable to fire it before Powell was upon him. The two scuffled, and the gun fell to the ground. The man fled around the corner and Powell picked up the gun. Powell began to run across Ruthven and was shot in the leg. He turned around and fired two shots at his assailant. He then ran up Humboldt to Homestead Street, turned left on Homestead, and headed into an alley, where he found a walking cane. He stayed in the alley until he was arrested.

### C. Other Guns

After the shooting, an arresting officer retrieved a set of keys from Powell. The keys were to a two-bedroom apartment at Fairlawn Estates in the Mattapan section of Boston. The police obtained a search warrant for the apartment, and executed the warrant the same night as the shooting. The search turned up two additional weapons: a fully-loaded black Taurus 9 mm. semi-automatic pistol with an obliterated serial number; and a .38 caliber derringer loaded with two rounds of ammunition. The Taurus was hidden in a laundry basket located in the apartment's master bedroom. The derringer was

hidden on a closet shelf in the second bedroom.

Although Powell claimed to be nothing more than a sporadic visitor to the Fairlawn Estates apartment, the evidence, taken in a light most favorable to the government, established that Powell and Boykins (Powell's girlfriend) were living there at the time of the shooting. Powell and Boykins had signed a rental application, lease, lease addendum, and rules and regulations acknowledgment for the apartment in August, 1992. Moreover, Boykins told the grand jury that she and Powell (along with their two children) were living in the apartment, and that she and Powell shared the master bedroom. This testimony was introduced at trial. Finally, the evidence showed that Powell's name was on the mailbox for the apartment; that only Powell and Boykins had keys to the apartment; that Powell had personally visited the Fairlawn Estates apartment manager's office on at least two occasions in the months prior to the shooting; and that Powell had once telephoned the apartment manager and made an oral request that repairs be made to the apartment. Boykins testified that Powell's cousin and her children also were staying at the apartment around the time of the shooting. Powell testified that his cousin's husband was staying there as well.

### D. Proceedings Below

On December 18, 1992, the grand jury returned a three-count indictment against Powell. Count I charged him with being a felon unlawfully in possession of the .44 used in the shooting. See 18 U.S.C. § 922(g)(1). Count II charged him with being a felon unlawfully in possession of the Taurus pistol, the derringer, and the ammunition found in the Fairlawn Estates apartment. See id. Count III charged him with unlawfully possessing a firearm—the Taurus—with an obliterated serial number. See 18 U.S.C. § 922(k). Prior to trial, the district court severed Counts II and III from the trial of Count I. The court also granted Powell's motion in limine requesting that the government not be allowed to refer to the firearms and ammunition which were the subjects of

Counts II and III during its opening statement or case-in-chief. The court did, however, reserve judgment as to whether evidence relating to Counts II and III might become admissible after the defense put on its case. The government complied with the court's order and did not allude to this evidence at any point during its case-in-chief.

The defense called Arvetta Boykins as a witness. She testified, in response to a question by defense counsel, that numerous random police searches of Powell in the months preceding the shoot-out had failed to turn up a weapon on his person or in his car. The government then asked the court to revisit its ruling in limine. At this point, the court allowed the government to cross-examine Boykins about whether she or Powell had stored in the Fairlawn Estates apartment the firearms described in Counts II and III of the indictment. The court ruled that defense counsel had "opened the door" to this inquiry by asking Boykins whether "she's seen him with a weapon on occasion." Defense counsel, who had asked only about police searches of Powell in the months preceding the shoot-out, denied having asked such a question. Boykins denied that the firearms were hers or Powell's. After Boykins completed her testimony, Powell himself took the stand and asserted, inter alia, that he had never had a firearm on him in the summer of 1992.

Subsequently, the court permitted the government to introduce the evidence underlying Counts II and III as part of its rebuttal case. The court informed the jury that it should not consider the firearms found in the Fairlawn Estates apartment at all unless it first found that Powell possessed them. The court also told the jury that, if it found that Powell did possess these firearms, it should not consider this evidence "to show that the defendant was the kind of person who possessed firearms, but rather to show that the defendant had an opportunity to obtain firearms, that the defendant had knowledge of the availability of firearms, that [his possession of the .44] was not a question of mere necessity." See Fed.R.Evid. 404(b). The jury convicted Powell of the crime alleged in Count I of the indictment. The government

thereafter dismissed the severed Counts, II and III.

On March 29, 1994, the district court sentenced Powell. The court first assigned him a base offense level of 20 pursuant to U.S.S.G. § 2K2.1(a)(4) (1993). The court then added the following nine offense-level increases: four levels because the possession of the .44 took place in connection with another felony offense, i.e., the unjustifiable killing of Stanley Owens, *see* § 2K2.1(b)(5); one level because Powell's offense and relevant conduct involved the possession of three firearms, *see id.* at § 2K2.1(b)(1); two levels because one of the firearms had an obliterated serial number, *see id.* at § 2K2.1(b)(4); and two levels because Powell obstructed justice by giving "perjurious" testimony, *see* § 3C1.1, comment. (n. 3(b)). These increases led to a final offense level of 29. Because Powell had a criminal history category of V, his guideline sentencing range was 140 to 175 months. In view of the ten-year statutory maximum applicable to the offense of conviction, *see* 18 U.S.C. § 924(a)(2), the court sentenced Powell to a 120–month term of imprisonment. In so doing, the court rejected Powell's request for a downward departure from the applicable sentencing range because Powell purported to have committed the offense of conviction "in order to avoid a perceived greater harm." *See* § 5K2.11 (allowing downward departures in some such situations).

## II.

Powell makes six arguments on appeal: (1) the district court committed reversible error in admitting evidence of the guns and ammunition found in the Fairlawn Estates apartment; (2) the court committed reversible error in permitting the government to impeach Powell with his prior felony convictions; (3) the court erred in increasing Powell's offense level by four on the grounds that Powell possessed the .44 in connection with another felony offense; (4) the court erred in increasing Powell's offense level by three for "relevant conduct" that included the possession of the guns found in the Fairlawn Estates apartment; (5) the court erred in increasing Powell's offense level by two for obstruction of justice; and (6) the court erred in declining to depart downward. We address each argument in turn.

### A. Admission of the Evidence from the Fairlawn Estates Apartment

Powell's argument relating to the evidence from the Fairlawn Estates apartment is tripartite. First, Powell contends that the evidence is not relevant because the jury could not reasonably have concluded that he possessed the guns and ammunition discovered during the search. Second, Powell asserts that the court erred in admitting the evidence under Rule 404(b), even if the jury could have found that he possessed the guns and ammunition. Third, Powell insists that the court erred in deciding that the probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," *see* Fed.R.Evid. 403, even if the evidence was otherwise admissible. In light of the deference we give to the challenged district court rulings, we discern no reversible error.

Because the court conditioned the jury's consideration of the evidence found in the Fairlawn Estates apartment upon its initially finding possession of this evidence by Powell, the first part of Powell's argument implicates Fed.R.Evid. 104(b). Rule 104(b) provides: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Like other admissibility rulings, the decision whether there is sufficient evidence to support a finding of the fulfillment of the condition is committed to the trial judge's "wide discretion." *See Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1371 (1st Cir.1991).

The Supreme Court has set forth the process by which the trial court should make this decision:

> In determining whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional

fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence. *Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). We therefore ask only whether the district court abused its discretion in deciding that the jury could reasonably find, by a preponderance of the evidence, that Powell possessed the Taurus and derringer.

■ Possession of firearms can be either actual or constructive. *See, e.g., United States v. Rogers,* 41 F.3d 25, 29 (1st Cir. 1994). In *Rogers,* we approved a jury instruction which explained:

"A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, or to exercise dominion or control over the area in which that thing is found, whether directly or through another person, is then in constructive possession of the thing."

*Id.* at 30 (emphases omitted). Thus, so long as one's dominion/control over the area containing the thing at the relevant time is established, "one can possess an object while it is hidden at home in a bureau drawer, or while held by an agent, or even while it is secured in a safe deposit box at the bank and can be retrieved only when a bank official opens the vault." *United States v. Zavala Maldonado,* 23 F.3d 4, 7 (1st Cir.) (interpreting scope of a drug possession statute), *cert. denied,* ── U.S. ──, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994).

■ In view of this broad understanding of "possession" and the applicable preponderance standard, *see Huddleston,* 485 U.S. at 690, 108 S.Ct. at 1501-02, we have little difficulty concluding that there was no abuse of discretion here. There was evidence that Powell was sharing the master bedroom of the Fairlawn Estates apartment at the time of the shooting; that he had signed a variety of forms relating to the apartment; that he had made a request for repairs to the apartment; that his name was on the mailbox; that he was one of only two persons with keys; and that the guns found there did not belong to the apartment's other primary adult resident—Boykins. This evidence was more than adequate for the court to have allowed the jury to consider whether Powell constructively possessed the Taurus and derringer that were hidden within the apartment. All the evidence tended to show Powell's dominion over the apartment in which the guns were found, and some of it—Boykins' testimony that the guns were not hers—tended to show that the guns were Powell's (although we acknowledge Boykins' further testimony that the guns were not Powell's). We therefore reject Powell's relevancy argument.

■ The second and third parts of Powell's argument against the admissibility of the evidence from the Fairlawn Estates apartment do not fare any better. In admitting this evidence, the district court employed the correct legal analysis. The court first determined that the evidence had "special relevance" to material issues raised by Powell's case—whether Powell possessed firearms in the months preceding the shoot-out, whether Powell had an opportunity to obtain firearms, whether Powell had knowledge of the availability of firearms, and whether Powell's possession of the .44 was a question of mere necessity—and that it was not being offered to show Powell's character or propensity for criminal conduct. *See, e.g., United States v. Tuesta-Toro,* 29 F.3d 771, 775 (1st Cir.1994) (explaining Rule 404(b) inquiry), *cert. denied,* ── U.S. ──, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995).

The court then decided that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See id.* (citing Rule 403). Because legal error did not infect the trial court's analysis, we afford the court's conclusions considerable deference. *See id.; see also United States v. Guyon,* 27 F.3d 723, 729 (1st Cir.1994) (trial court's Rule 404(b) ruling reversible only if the court abused its discretion); *Veranda Beach Club,* 936 F.2d at 1372 (trial court's construction of Rule 403's probative value/unfair prejudice balance subject to substantial deference on appeal); *United States v. Wood,* 982 F.2d 1, 4 (1st Cir.1992) (decision whether to permit the introduction

of rebuttal evidence is within sound discretion of the trial judge).

█ ¡Again, we see no abuse of discretion. Although the court may have oversimplified a bit in asserting that defense counsel had asked Boykins whether she'd seen Powell with a weapon on occasion, we think the court permissibly admitted the challenged evidence to rebut the implication plainly inhering in Boykins's testimony regarding the futile police searches of Powell in the months preceding the shoot-out: that Powell was not a possessor of firearms at the time of the shooting. We think that the challenged evidence bore special relevance to whether Powell only came into the possession of the .44 as a matter of necessity, or whether he was armed at the time the shooting began.

█ As we have just stated, Powell attempted to bolster his necessity defense by introducing evidence—his and Boykins' testimony—suggesting that he was not a possessor of firearms at the time of the shoot-out. In other words, Powell introduced evidence that he did *not* commit other similar acts at the relevant point in time. While other-acts evidence is not generally admissible "to prove the character of a person in order to show action in conformity therewith," *see* Rule 404(b), it is admissible to rebut a *defendant*'s affirmative claim that s/he did not commit other similar acts at the relevant point in time. *See, e.g., Wood,* 982 F.2d at 4 ("rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof") (citation omitted); *see also United States v. Zarnes,* 33 F.3d 1454, 1470 (7th Cir.1994) (evidence of marijuana plants growing in defendant's vegetable garden admissible to rebut defendant's mother's testimony that there were no marijuana plants in the garden). The court therefore did not err in allowing the jury to consider whether Powell's contemporaneous constructive possession of the weapons in the Fairlawn Estates apartment tended to show that his possession of the .44 "was not a question of mere necessity."

█ Finally, the court's careful and well-crafted limiting instruction—which told the jury that the evidence was not admissible to show that Powell was the kind of person who possessed firearms—largely dissipates any concern we might have had about the danger of *unfair* prejudice to Powell. Simply put, we see no reason why the jury could not have followed the court's instruction in this case.

We therefore reject Powell's argument that the admission of the evidence from the Fairlawn Estates apartment ran afoul of Rules 404(b) and 403.

### B. Impeachment of Powell with his Prior Felony Convictions

Powell next complains that the government's use of the number of his prior felony convictions for impeachment purposes (including its reference to the fact that, in one of these cases, Powell was convicted under a different name in another session of the district court) amounts to reversible error. Citing *United States v. Tavares,* 21 F.3d 1 (1st Cir.1994) (en banc), Powell claims that his willingness to stipulate to the fact that he had been convicted of a felony should have precluded the government from pursuing this line of questioning. Powell misreads *Tavares* and overlooks Fed.R.Evid. 609(a)(1).

█ A conviction under § 922(g)(1) requires proof of three elements: (1) that the defendant knowingly possessed a firearm; (2) that the defendant had "been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" at the time of the possession; and (3) that the possession was in or affecting interstate or foreign commerce. *United States v. Tracy,* 36 F.3d 187, 191 (1st Cir.1994). In *Tavares,* we held that if a defendant wishes to stipulate to the second of these three elements, "evidence beyond the fact of the prior conviction is inadmissible absent adequate trial court findings that its noncumulative relevance is sufficiently compelling to survive the balancing test of Fed.R.Evid. 403." 21 F.3d at 5. Thus, if there is such a stipulation in a § 922(g)(1) prosecution, the government ordinarily may not introduce evidence of the nature or number of prior convictions *as part of its case-in-chief. See id.* at 5–6. We were careful to point out in *Tavares,* however, that "in some cases evidence concerning the nature of the prior conviction will be admissible

for impeachment or other reasons, despite its lack of probative value on the prior element of the crime." *Id.* at 6.

Here, the government did not introduce evidence of the number of Powell's prior felony convictions in order to prove an element of its case; it introduced this evidence to *impeach* Powell after he took the stand in his own defense. We recently have made clear what we implied in *Tavares:* that *Tavares* does not control in the impeachment context. *See Tracy,* 36 F.3d at 191–92. Rather, the admissibility of the impeachment evidence must be evaluated under Rule 609(a)(1). This Rule provides:

> **General Rule.** For the purpose of attacking· the credibility of a witness, ... evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused.

■ The upshot is that the evidence at issue was properly admitted absent a showing that the trial court abused its discretion in determining that its probative value outweighed its prejudicial effect to Powell. *See Tracy,* 36 F.3d at 193 ("We review a district court's probative value/prejudicial effect decision under Fed.R.Evid. 609(a)(1) for abuse of discretion."). Powell has not argued that there was an abuse of discretion here; he has asserted only that *Tavares* is controlling. Our own independent review of the record reveals no abuse of discretion by the district court. Indeed, allowing the government only to inquire into the number, and not the *nature*, of Powell's prior felony convictions strikes us as an eminently fair way to balance the government's interest in impeaching Powell with Powell's interest in avoiding the "unique risk of prejudice" present whenever a testifying defendant is impeached with evidence of his/her prior convictions: "the danger that convictions that would be excluded under Fed.R.Evid. 404 will be misused by a

jury as propensity evidence despite their introduction solely for impeachment purposes." Fed.R.Evid. 609 advisory committee's note, 1990 amendment; *see also Tracy,* 36 F.3d at 192.

We therefore reject Powell's claim of reversible error in the introduction of this evidence.

### C. Four–Level Increase for Possession in Connection with Another Felony Offense

The district court found at sentencing that Powell's possession of the .44 was committed in connection with another felony offense—the unjustified killing of Stanley Owens. The court explained its finding as follows:

> I find, first, that the defendant was engaged in activity which involved him in an unjustified homicide. I do not credit the defendant's testimony—indeed, I find it to have been perjurious—as to the manner in which he found himself in possession of the firearm here. Accordingly, I find that the defendant was in possession of the firearm in connection with another felony offense, an unjustifiable homicide under state law. I will not get into the particulars of how that may have been charged under state law, what degree of murder or manslaughter, simply that there was no defense of self-defense. There was no defense of necessity. There was no defense for the defense of other persons, but rather that the defendant chose to place himself in the middle of a shootout in which he chose not to withdraw, but to engage.

The court therefore increased Powell's offense level by four. *See* § 2K2.1(b)(5). Powell takes issue with the court's finding, arguing that there was no evidence to support it. We do not agree with Powell's argument.

■ The standard by which we review a district court's application of a sentencing guideline depends upon the nature of the challenge before us. If a party claims error in the court's interpretation of a guideline's meaning or scope, our review is plenary. *E.g., United States v. Thompson,* 32 F.3d 1, 4 (1st Cir.1994). If a party assigns error to a factual finding made at sentencing, we review

the finding for clear error. *See id.* at 4–5. In so doing, we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence. *See United States v. Mocciola,* 891 F.2d 13, 17 (1st Cir.1989).

█ It is important to note that Powell does not challenge the trial court's apparent legal conclusion that the killing of Stanley Owens was *necessarily* unjustified if, as the court found, Powell placed himself into the middle of the shoot-out instead of withdrawing. *Cf. Commonwealth v. Kendrick,* 351 Mass. 203, 218 N.E.2d 408, 414 (1966) ("The right of self-defence does not accrue to a person until he has availed all proper means to avoid physical combat."). In his brief, Powell questions only the factual finding itself (along with the statement that "there was no defense of self-defense," which he treats as a separate finding), asserting that there was no evidentiary basis to support the court's upward adjustment. We therefore will not review the trial court's legal conclusion, and will look only to whether the outcome-determinative finding—that Powell chose to place himself in the middle of the shoot-out instead of withdrawing—was clearly erroneous. We think that it was not.

Central to our decision is the court's tacit determination that Powell knew of the possibility of a shoot-out prior to its taking place. Especially given the applicable preponderance-of-the-evidence standard, this determination is sustainable. Immediately after seeing the hooded men in the Subaru and hearing the car rapidly accelerate in reverse, Powell insisted that Boykins and her mother get out of the area as quickly as possible. This gives rise to an inference that Powell knew serious trouble might ensue. Moreover, Powell conceded on cross-examination that he thought the men in the Subaru were gang members, and that he knew there had been at least one shooting in the area in the previous week.

Also important to our conclusion is the court's finding that Powell possessed the .44 prior to the inception of the shoot-out (a finding which is implicit in the court's stated disbelief of Powell's testimony "as to the manner in which he found himself in posses-

sion of the firearm here"). This finding, too, is sustainable. Powell's trial testimony as to how he came to possess the .44 not only contradicted the accounts he gave to an arresting officer shortly after the shoot-out, but it also was inherently improbable. Powell testified that, instead of taking cover inside Humboldt Liquors with Cheney and Rhodes when shots unexpectedly began to ring out (as one might have expected him to do), he began running and (1) continued to run up the street towards a man who had come around the corner and was pointing a gun at him; (2) closed the distance between the man and himself before the man could fire a shot; (3) disarmed the man, seized his gun, and chased him off; and (4) turned on the run and shot and twice hit an assailant who allegedly was shooting at him from behind. The implausibility of this testimony alone is sufficient to ground the court's contrary finding. *Cf. United States v. Hadfield,* 918 F.2d 987, 999 (1st Cir.1990) (implausibility of a defendant's testimony can be affirmative evidence of guilt), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). Furthermore, there was hearsay evidence in the Pre–Sentence Report indicating that a confidential informant had seen Powell with the .44 prior to the shooting. Though not introduced at trial, this evidence was available to the district court at sentencing. *See United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992) (court may rely on hearsay evidence at sentencing).

What we have, then, is an armed Powell not only remaining at a location where he knows a shoot-out is possible, but also seeking out the two young men (Cheney and Rhodes) who were involved in the initial confrontation—a confrontation that prompted Powell to insist that Boykins and her mother leave the area immediately. In view of this factual scenario, we cannot say that the court clearly erred in finding that "defendant chose to place himself in the middle of a shootout in which he chose not to withdraw, but to engage." For the reasons stated above, this ends our inquiry.

We therefore reject Powell's challenge to the district court's finding that the .44 was

possessed in connection with another felony offense.

### D. Three–Level Increase for Possession of the Guns Found in the Fairlawn Estates Apartment

■ The district court found at sentencing that Powell possessed the guns found in the Fairlawn Estates apartment. It therefore increased Powell's offense level by one for possession of the guns, see § 2K2.1(b)(1), and by two because one of the guns had an obliterated serial number, see § 2K2.1(b)(4). Powell challenges this finding on two grounds. First, he contends that there was insufficient evidence to support the finding. Second, he asserts that his possession of these guns was not "part of the same course of conduct or common scheme or plan as the offense of conviction," as is required by § 1B1.3(a)(2). We are not persuaded by Powell's arguments.

As we already have explained, the district court did not abuse its discretion in deciding that the jury could find, by a preponderance of the evidence, that the guns in the Fairlawn Estates apartment were possessed by Powell. See supra Section II–A. While fine semantic distinctions may make it theoretically possible for a court to have acted within the bounds of its discretion in deciding that a jury could make a preponderant finding, and then to have committed clear error in making the same preponderant finding itself, we are confident that this is not such a case. We therefore rely on our earlier explanation in rejecting Powell's sufficiency argument.

■ Although Powell's "same course of conduct" argument has some superficial appeal—after all, the guns in the Fairlawn Estates apartment did not play any role in the Powell's possession of the .44 on Humboldt Avenue—it is foreclosed by circuit precedent. In United States v. Sanders, 982 F.2d 4 (1st Cir.1992), we analyzed whether a defendant who had pleaded guilty to being a felon in possession of a firearm and to using or carrying a firearm during and in relation to a drug trafficking crime could be subjected to an upward departure for possessing a weapon (used to shoot his girlfriend in the head) which was not named in the indict-

ment. See 982 F.2d at 9–10. Answering this question required us to consider the scope of the "same course of conduct provision" in § 1B1.3(a)(2), because the possession of the gun used in the shooting could only be taken into account at sentencing if it constituted relevant conduct under § 1B1.3. Id. at 9. In answering the question in the affirmative, we said:

> The "same course of conduct" concept looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be connected together by common participants or by an overall scheme. Here, defendant did repeat the same type of criminal activity—he illegally possessed three or four separate firearms when the victim was shot. We have no difficulty viewing the illegal possession of the four weapons as all part of the same course of conduct.

Id. at 9–10 (citation, ellipses, and internal quotation marks omitted). In other words, the contemporaneous, or nearly contemporaneous, possession of uncharged firearms is, in this circuit, relevant conduct in the context of a felon-in-possession prosecution. See id.

In this case, Powell clearly possessed the guns in the Fairlawn Estates apartment at the same time that he possessed the .44 used in the shooting. Accordingly, the district court did not err in finding that the possession of these weapons was part of the same course of conduct as the offense of conviction.

We therefore reject Powell's challenge to the court's three-level increase for the guns found in the Fairlawn Estates apartment.

### E. Two–Level Increase for Obstruction of Justice

The district court found at sentencing that Powell gave perjurious testimony as to how he came into possession of the .44. The court therefore increased Powell's offense level by two for obstruction of justice. See § 3C1.1. Powell challenges this finding on two grounds. First, he contends that it was not accompanied by necessary subsidiary findings that the false testimony was "concerning a material matter" and given "with the willful intent to provide false testimony,

rather than as a result of confusion, mistake, or faulty memory." *See United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). Second, he asserts that it was not supported by the evidence. We need not and do not reach the merits of Powell's arguments (though we observe that we already have found there to be sufficient evidence to support the district court's implicit finding that Powell possessed the .44 prior to the shoot-out. *See supra* Section II–C.).

Because we have affirmed each of the other upward adjustments imposed by the sentencing court (*see supra* Sections II–C and II–D), Powell's 120–month sentence would remain unchanged even if we were to find error in the court's two-level obstruction enhancement. Reducing Powell's base offense level by two would still give him a guideline range of 120–150 months. Thus, the sentencing court would be without the power to give him a lower sentence than the 120–month term of imprisonment he actually received.

We therefore decline to address Powell's challenge to the district court's finding that he obstructed justice by giving perjurious testimony.

### F. Refusal to Depart Downward

The district court declined Powell's request for a downward departure because he allegedly committed the offense of conviction "in order to avoid a perceived greater harm"—injury to himself or others. *See* § 5K2.11. The court explained its decision as follows:

> And with respect to objection number 31, I understand that to be the argument made by the defendant here for downward departure in this case. I must indicate that the defendant's actions here were not those of a good samaritan seeking to protect the community and the lives of other persons and it strikes me as not a grounds [sic] for downward departure in this setting.

While acknowledging that we have no jurisdiction to review discretionary refusals to depart downward, *see, e.g., United States v. Lewis,* 40 F.3d 1325, 1345 (1st Cir.1994)

(court of appeals lacks jurisdiction to review district court's refusal to depart downward so long as court was aware of its authority to do so), Powell seizes on the court's use of the term "good samaritan" and asserts that the court failed to understand that it could depart if it found that Powell's possession of the firearm was prompted by the need for *self*-preservation. Powell's argument is unconvincing.

As we have already explained, the district court clearly believed that Powell possessed the .44 prior to the inception of the shoot-out. *See supra* Section II–C. This necessarily means that Powell possessed the .44 prior to the time when any need for self-defense would have arisen. Accordingly, the court could not have found that Powell's illegal possession was prompted by the need to protect himself. This leads us to conclude beyond any doubt whatsoever that the court did not misunderstand its departure authority under § 5K2.11; it merely decided that the facts did not warrant a departure in this instance, and used the term "good samaritan" a bit loosely in explaining its decision.

We therefore lack jurisdiction over Powell's challenge to the court's decision not to depart downward.

### III.

For the reasons stated, we *affirm* the conviction and sentence of defendant Charles Powell.