RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KARL DEVON AMERSON,

*Defendant-Appellant.*

No. 17-1713

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cr-00176-1—Janet T. Neff, District Judge.

Argued: March 6, 2018

Decided and Filed: March 27, 2018

Before: COLE, Chief Judge; WHITE and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Peter A. VanGelderen, WILLEY & CHAMBERLAIN LLP, Grand Rapids, Michigan, for Appellant. Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Peter A. VanGelderen, WILLEY & CHAMBERLAIN LLP, Grand Rapids, Michigan, for Appellant. Alexis M. Sanford, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge. When are two crimes "part of the same course of conduct?" For a defendant like Karl Amerson, who illegally possessed firearms on two different

occasions, the answer under section 1B1.3(a)(2) of the United States Sentencing Guidelines (USSG) could mean almost twice as many years in prison.

Amerson pleaded guilty to one count of being a felon in possession of a firearm after police officers discovered a rifle and a pistol in his home. In exchange for his plea, the government agreed not to prosecute him for his previous possession of a different handgun, three and a half months before. But that agreement did not bar the government from arguing at sentencing that Amerson's uncharged handgun possession was "part of the same course of conduct" as his rifle-and-pistol conviction and was thus relevant conduct for purposes of calculating Amerson's sentence. The district court agreed with the government. The result? A near doubling of Amerson's sentencing range.

Amerson contends that this relevant-conduct determination was erroneous because the government showed no connection between the gun possession that resulted in his conviction and his prior gun possession. We agree. For two, non-contemporaneous illegal firearm possessions to be considered part of the same course of conduct, they must, among other factors, be connected by strong evidence of similarity. Because the government failed to prove enough similarity between Amerson's illegal firearm possessions, we reverse the district court's relevant-conduct finding.

Amerson also appeals the district court's determination that he attempted to obstruct justice, warranting a higher offense level under USSG § 3C1.1. Because the evidence showed that Amerson took a substantial step toward his goal of having someone else claim ownership of his rifle, we affirm the obstruction-of-justice enhancement.

I.

The facts are undisputed. On May 6, 2016, in Battle Creek, Michigan, Karl Amerson and some of his friends got into an argument with another group of people at a gas station. Amerson and some of his group left in an Avalanche truck. Shortly after, a white car pulled up beside them and the occupants of the cars shot at each other. Amerson, who was driving the Avalanche, was wounded in the gunfight and drove to a local hospital for treatment. During an investigation of the shooting, police officers recovered spent .40 caliber ammunition casings from the

Avalanche. They also seized a .40 caliber handgun from another car associated with the shooting that was also parked outside the hospital. The driver of that car was Jerel Barton, who was "an associate of Mr. Amerson" and was in the Avalanche during the shooting. Appellant's Br. at 5–6. The handgun seized from Barton's vehicle tested positive for Amerson's DNA. Amerson was not arrested or charged for conduct related to this incident.

About three and a half months later, on August 26, 2016, police officers responded to another call about a gunfight in Battle Creek. The shootout involved occupants of two cars. Officers found one of the involved cars abandoned a half mile from the scene of the gunfight with bullet holes in its exterior. No firearms were found in the vehicle. The officers knew that the car belonged to the girlfriend of one of Amerson's friends, Demarcus Bolden, and that it had often been seen outside Amerson's apartment at 99 Green Street.

The officers then made two separate visits to Amerson's apartment to look for Bolden. During both visits, Amerson's girlfriend, who was the lessee of the apartment, gave the officers permission to search it. The first search was brief, and after the officers did not find Bolden in the apartment, they left. The officers then interviewed neighborhood witnesses, who reported seeing two black males and a white female leave the car involved in the shooting, observing that the female retrieved a walker from the car for one of the black males who had a severe limp.[1] Based on this information, the officers returned to 99 Green Street.

Amerson fit the description of one of the males. He is a black male and had trouble walking. In particular, during their second visit to Amerson's residence, the officers observed Amerson sitting on a couch with his leg elevated. He was recovering from having been shot during an altercation at a house party three weeks before. The officers saw Amerson use a walker when he moved.

---

[1]The presentence report also states that the officers "had information that Mr. Amerson . . . had been observed in one of the suspect vehicles earlier that day." It is unclear from the presentence report when the officers obtained this information.

At this point, the police searched the apartment for a second time, again with Amerson's girlfriend's consent. Their search resulted in the discovery of a loaded .22 caliber semiautomatic rifle, a loaded .380 caliber semiautomatic pistol, and various cases of ammunition. Amerson made unsolicited admissions about owning the rifle, and the officers arrested him.[2]

As noted, the officers had evidence that Amerson was at the August 26, 2016 shootout. But none of Amerson's admissions nor any other evidence directly linked any of the weapons seized from Amerson's residence to the shootout.

While in custody, Amerson called his girlfriend several times. During these phone calls, he asked her to claim ownership of the rifle and threatened to harm Bolden's girlfriend, Shannon Kline, who had been present when officers searched Amerson's residence and who, according to Amerson, was "the reason law enforcement made contact with 99 Green Street." Appellant's Br. at 10. On the first call, Amerson told his girlfriend, "I need you to do one favor for me . . . I need you to claim that rifle because as long as you claim that, they can't do shit about [it]." He also stated, "I'm blowing Shannon's shit out when I get out, cause . . . this all over that bitch." In a second phone call, he asked his girlfriend to "get the rifle back." He again stated, "I'm blowing Shannon's shit clean out . . . somebody better beat that bitch's ass." And when he learned during the phone call that Kline was present in the apartment, he said, "I'm smacking the skin off that bitch . . . I'm going to have Lay Lay mop her ass." During the third call, Amerson told his girlfriend, "if you come down here for the rifle, let them know it's yours, they going to drop that." Amerson's girlfriend responded that her claiming the rifle might affect her schooling, and that she might try to find someone else to claim it. The next day, during a phone call, she informed Amerson that she was not going to claim the rifle, and ultimately, she did not claim it.

## II.

Amerson was indicted for possessing the rifle, pistol, and ammunition in his apartment. He pleaded guilty on February 9, 2017. At his plea hearing, Amerson admitted that 99 Green Street was his residence and that he owned both guns and had put them there. He also admitted

---

[2]Amerson had a prior felony conviction from December 1, 2014.

that he had a prior felony conviction. As part of his plea agreement, the government agreed not to prosecute Amerson for his May 2016 handgun possession.

Before sentencing, the United States Probation Department ("Probation Department") prepared a presentence report. It included the May 2016 shooting incident as relevant conduct. This led to a two-level increase in the offense level for number of firearms, *see* USSG § 2K2.1(b)(1)(A), and a four-level enhancement for possession of a firearm in connection with another felony offense,[3] *see id.* § 2K2.1(b)(6)(B). Together, these enhancements increased Amerson's base-level Sentencing Guidelines range from 30–37 months of imprisonment to 57–71 months of imprisonment. The presentence report also included an increase to the offense level for obstruction of justice under USSG § 3C1.1. This enhancement increased Amerson's Sentencing Guidelines range from 57–71 months of imprisonment to 70–87 months of imprisonment. Amerson objected to these enhancements.

Responding to Amerson's objection to the relevant-conduct determination, the Probation Department countered that Amerson was a convicted felon who illegally possessed firearms, and the investigation showed that months earlier, he had illegally possessed another firearm. The government filed a sentencing memorandum and noted that "two shootings occurred with Amerson present at both . . . Amerson repeatedly carried firearms when it was illegal for him to do so; such behavior is relevant conduct under the guidelines."

At sentencing, the district court heard arguments about the relevant conduct. The court found that "for the reasons laid out by the probation officer and by the government, the events of May 6th do constitute relevant conduct." The district court also heard arguments on whether Amerson's recorded phone calls established that he had attempted to obstruct justice. The court noted that Amerson "attempt[ed] to have [his girlfriend] claim that weapon as hers." The court also noted that Amerson made statements where, "while he wasn't threatening the other person directly, he was saying some pretty awful things about what he intended to do to her . . . when he was out." Ultimately finding that the obstruction-of-justice enhancement was "well supported by a preponderance of the evidence," the court denied the objection. The court sentenced Amerson

---

[3]That "felony offense" was the May 6, 2016 shooting, characterized in the presentence report as "Assault with a Deadly Weapon."

to 76 months, within the 70–87 months Guidelines range, followed by four years of supervised release.

Amerson appealed.

III.

Amerson contends that the district court improperly calculated his Guidelines range by incorrectly finding that his illegal handgun possession in May 2016 was "relevant conduct" for purposes of sentencing him for his illegal possession of firearms in August 2016. *See* USSG § 1B1.3(a)(2). The government argues that Amerson's prior illegal handgun possession was relevant conduct because it was part of the "same course of conduct" as his offense of conviction because "both incidents involved Amerson's illegal possession of a firearm, both incidents involved gunfights between vehicles, and the illegal behavior occurred twice in a three-month span." Appellee's Br. at 10.

Under the advisory Guidelines, we review a criminal defendant's sentence for reasonableness. *United States v. Pirosko*, 787 F.3d 358, 372 (6th Cir. 2015). We accept the district court's factual findings unless they are clearly erroneous. 18 U.S.C. § 3742(e). But we ensure that the district court made no significant procedural error like

> failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, 552 U.S. 38, 51 (2007).

Because a district court's relevant-conduct determination involves the application of law to facts, we review de novo. *United States v. Phillips*, 516 F.3d 479, 483 (6th Cir. 2008) (citing *United States v. Shafer*, 199 F.3d 826, 830 (6th Cir. 1999)). The government bears the burden of proving, by a preponderance of the evidence, that another offense constituted relevant conduct. *Id.* (citing *United States v. Moored*, 997 F.2d 139, 144 (6th Cir. 1993)).

Amerson's May 2016 handgun possession is relevant conduct if it was "part of the same course of conduct or common scheme or plan" as his underlying August 2016 felon-in-

possession offense.  USSG § 1B1.3(a)(2).  The government does not argue that Amerson's handgun possessions were part of a common scheme or plan.  It argues only that Amerson's uncharged handgun possession was part of the same course of conduct as his underlying rifle-and-pistol conviction.

Offenses are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  *Id.* § 1B1.3 cmt. n.5(B)(ii).  In analyzing the connection between offenses, we consider three factors:  "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."  *Id.*  "When one of [these] factors is absent, a stronger presence of at least one of the other factors is required."  *Id.*; *see also Phillips*, 516 F.3d at 483 (describing our approach to these factors as a "sliding scale" that allows for stronger evidence of one factor to compensate for weaker or absent evidence of another).  In looking for stronger evidence of similarity, we may consider whether the conduct involves common victims, common offenders, a common purpose, or a common modus operandi.  *United States v. Hill*, 79 F.3d 1477, 1483 (6th Cir. 1996).

We begin with regularity.  The government proved the bare minimum—only one other offense, Amerson's illegal handgun possession in May 2016.  Any case involving a relevant-conduct determination involves at least one other instance of conduct.  So, in cases like this, regularity is "completely absent" where the government shows only one other offense.  *Id.* at 1484.  Without evidence of regularity, the government needed to prove stronger evidence of similarity or temporal proximity.  *Cf. Phillips*, 516 F.3d at 483–84 (relying on stronger evidence of regularity and similarity in upholding relevant-conduct determination when evidence of temporal proximity was weak).

The time between Amerson's two illegal possessions is short.  His willingness to engage in the same type of criminal activity in a three-and-a-half-month period cuts in favor of a course-of-conduct finding.  Indeed, the gap between Amerson's offenses is well within the nine-month period that we have identified as sufficient for upholding a course-of-conduct determination involving several illegal firearm possessions.  *See Phillips*, 516 F.3d at 483–84 (surveying cases); *see also United States v. Gales*, 137 F. App'x 875, 877–78 (6th Cir. 2005) (upholding

relevant-conduct determination when defendant was convicted for unlawful possession of a firearm and was found to have possessed two other firearms within two months from charged conduct). Thus, if the government had proved adequate evidence of regularity and similarity, it would be easy to conclude that Amerson's illegal gun possessions within three and a half months were part of the same course of conduct. *See id.* at 877; *United States v. Tate*, 97 F.3d 1453 (6th Cir. 1996) (unpublished table decision) (affirming relevant-conduct determination involving two drug-sale offenses when they occurred within two months of each other, they both involved the same drug, and the government proved "that defendant engaged in this conduct on a regular basis").

But here the government proved no regularity, so *stronger* timing evidence was necessary. For an example of strong enough timing evidence look to *United States v. Powell*, 50 F.3d 94 (1st Cir. 1995). There, the First Circuit upheld a finding that guns found in the defendant's apartment shortly after his arrest (that played no role in his underlying possession of a handgun outside his apartment) were part of the same course of conduct because the defendant "clearly possessed the guns in [his] apartment at the same time that he possessed the [handgun]." *Id.* at 104. As the court explained "the contemporaneous, or nearly contemporaneous, possession of uncharged firearms is . . . relevant conduct in the context of a felon-in-possession prosecution." *Id.*; *see also United States v. Conway*, 513 F.3d 640 (6th Cir. 2008) (upholding relevant-conduct determination for defendant's contemporaneous possession of a sawed-off shotgun when sentencing him for being a felon in possession of a pistol).

But Amerson's case does not involve contemporaneous or near-contemporaneous possessions of firearms. He possessed a handgun in May 2016 and then possessed the firearms underlying his conviction three and a half months later. Thus, while the government showed *some* evidence of temporal proximity, a several-month gap between illegal possessions is not strong enough timing evidence to overcome a complete lack of regularity and prove that the possessions were part of the same course of conduct.

So with only some evidence of temporal proximity and no showing of regularity, the government had to show stronger evidence of similarity. The government asserts that it met its burden because it showed that Amerson possessed both sets of firearms during gunfights

between occupants of cars. Amerson responds that if the district court found similarity on this ground, its finding was clearly erroneous because nothing showed that his rifle and pistol possession involved a gunfight.

We agree with Amerson. The undisputed evidence shows that (1) after the shootout, witnesses saw two black males and a white female exit a car involved in the shootout, one of the males was limping, and the female retrieved a walker from the car; (2) Amerson, a black male, was hobbled and using a walker at the time of the shootout; (3) Amerson had been observed in one of the suspect vehicles earlier that day; (4) the car involved in the shootout was often seen at Amerson's residence; and (5) hours after the shootout, police officers seized Amerson's rifle and pistol from his apartment. These facts support the district court's inference that Amerson was present during the August 2016 shootout. But the district court clearly erred when it found that Amerson's rifle and pistol were there too.

The government presented no evidence to suggest that the firearms located at Amerson's residence had been anywhere but there. No one saw Amerson's guns at the scene of the shootout or at the scene of the abandoned car after the shootout. The guns were seized from a different location, his residence, hours after the shootout. And there is no evidence that those guns were consistent with the ones alleged to have been used during the shootout. In fact, the government presented no testing or other evidence to show that Amerson had discharged a firearm on that evening.

Even so, the government argues that if the district court could infer that Amerson was present at the gunfight, it could also infer that his rifle and pistol were there too. The government relies on *United States v. Yett*, which upheld a sentencing court's findings as based on reasonable inferences. 85 F. App'x 471 (6th Cir. 2004). But *Yett* cannot bear the weight that the government hangs on it. In *Yett*, the district court inferred that the defendant constructively possessed a firearm. *Id.* at 474. We found the inference reasonable even though someone else owned the firearm because the defendant had access to the safe where it was found; a key ring in the defendant's car contained a key to the safe; and shells to a shotgun that the defendant was found guilty of possessing were also found in the safe. *Id.* Thus, in *Yett* we concluded that the district court's ruling was not clearly erroneous because it was based on

"logical inferences" and a strong "evidentiary foundation." *Id.* Here, with no evidence linking Amerson's guns to the August shootout, the district court clearly erred when it inferred that the guns were there simply because he was. That was pure speculation.

The government asks us to bridge the gap between what it proved and what it needed to prove. Even if the evidence does not support the proposition that the rifle and pistol were involved in the August shootout, says the government, the proximity in timing between the shootout and the confiscation of Amerson's weapons allowed the district court to find that Amerson constructively possessed his rifle and pistol contemporaneously with the shootout. From this, the government requests that we uphold the district court's finding that Amerson possessed those guns in a substantially similar context to his possession in May 2016.

The government's reliance on a constructive-possession theory does not save its case. "Constructive possession occurs when a person knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Jackson*, 877 F.3d 231, 238 (6th Cir. 2017) (internal quotation marks omitted). Here, the government provided no evidence that Amerson had either the power or the intention to exercise dominion or control over the rifle or pistol during the August shootout. That he was storing these guns at his residence while he was allegedly involved in the shootout in another location establishes no connection between those firearms and that shootout. *Cf. id.* (rejecting enhancement for using or possessing a firearm in connection with a drug transaction when defendant kept his guns and drugs housed at separate locations, because he did not bring the gun and drugs together to either of two sales, and he had no reason to expect there would be a gun sale when he sold the drugs). Thus, the district court clearly erred when it found a relationship between Amerson's guns and the August 26 shootout.

Without this relationship, the government lacks the stronger evidence of similarity necessary to support the finding that Amerson's gun possessions were part of the same course of conduct. Our analysis in *Phillips* is instructive. There too we addressed a course-of-conduct determination in a case involving several instances of illegally possessing a firearm. *See Phillips*, 516 F.3d at 483–85. Instead of a lack of regularity, the case involved a "significant time lapse between offenses." *Id.* at 485. We upheld the course-of-conduct determination

because the case presented stronger evidence of both remaining factors—regularity and similarity. *Id.* at 483–85. We found stronger evidence of regularity based on the two additional identified incidents of firearm possession and the fact that the defendant had "indicated that he carried firearms regularly." *Id.* at 484–85. As to similarity, we noted that the defendant's own admissions showed that the firearm possessions were "linked by a common purpose: self-defense." *Id.* at 485.

Here, like in *Phillips*, the government had to overcome a lack of one of the course-of-conduct factors. There is some evidence of similarity between Amerson's offenses because both offenses involved illegally possessing a firearm while a felon. *See id.* at 485 (recognizing some degree of similarity because defendant's additional conduct was "identical to the offense of conviction"). But the *Phillips* court looked deeper than this in searching for stronger evidence of similarity. Indeed, the court found it "important[]" that the government proved that both offenses shared the common purpose of self-defense. *Id.* at 485. This emphasis on a common purpose suggests that some additional evidence of similarity—something more than the fact that both offenses involved illegal firearm possession—is necessary to overcome a total lack of another course-of-conduct factor. *See id.*; *cf. Hill*, 79 F.3d at 1483 ("When considering the similarity factor, the conduct should not be considered at a level of generality that would render worthless the relevant conduct analysis."); *Gales*, 137 F. App'x at 878 (upholding relevant-conduct determination and emphasizing that the government proved "a compelling similarity between the incidents—by showing a common purpose (selling the firearms) and a similar mode of operation (selling stolen firearms to the same store)").

To prove that Amerson's prior possession was part of the same course of conduct as his underlying possession, the government had the burden of bolstering the similarity and timing factors to compensate for the lack of regularity. It failed to show that Amerson's May and August possessions were connected in any significant way. There were no common victims, common accomplices, common purpose, or similar modus operandi. *See Hill*, 79 F.3d at 1483. And the possessions took place at different locations. *See United States v. Henry*, 819 F.3d 856, 865 (6th Cir. 2016) (upholding relevant-conduct determination in part because defendant's illegal sales of firearms both took place at his residence). Thus, the district court erred in finding

that Amerson's illegal handgun possession in May 2016 was relevant conduct under USSG § 1B1.3(a)(2).

The out-of-circuit cases that the government cites cannot salvage the district court's relevant-conduct finding. Three of the four are distinguishable because they involved greater evidence of regularity. *See United States v. Brummett*, 355 F.3d 343, 345 (5th Cir. 2003) (defendant possessed four firearms on three separate occasions within a nine-month period); *United States v. Windle*, 74 F.3d 997, 1000–01 (10th Cir. 1996) (defendant possessed five illegal firearms over four- to five-month period); *United States v. Nichols*, 464 F.3d 1117, 1124 (9th Cir. 2006) (defendant admitted he often possessed stolen weapons and possessed firearms contemporaneously with the offense conduct). In those cases, stronger evidence of similarity was not needed because the government presented adequate evidence of each factor. So the analysis in those cases was inherently different than ours here.

Though the remaining case cited by the government is analogous to Amerson's, we decline to follow it. There, the Seventh Circuit held that a defendant's uncharged assault-rifle possession was part of the same course of conduct as his offense of conviction—illegal possession of two handguns—because the two possessions occurred within a six- to nine-month period. *See United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998). In concluding that one additional instance of unlawful possession was relevant conduct, the *Santoro* court relied on the First and Tenth Circuit cases *United States v. Powell*, 50 F.3d 94 (1st Cir. 1995) and *United States v. Windle*, 74 F.3d 997 (10th Cir. 1996).

But the facts in *Santoro* (like those here) were materially different from those in *Powell* and *Windle*. *Powell* involved contemporaneous or near-contemporaneous possession of weapons. *Powell*, 50 F.3d at 104. And *Windle* involved a "behavior pattern of unlawfully possessing *five* firearms over a relatively short [four- to five-month] period of time." *Windle*, 74 F.3d at 1001 (emphasis added). In other words, the temporal proximity in *Powell* was strong enough to overcome a lack of regularity, and *Windle* involved evidence of all the course-of-conduct factors, so strong evidence of similarity was not required. *Santoro* involved neither of these circumstances. Yet these significant differences went unexplained in *Santoro*. The Guidelines instruct that "[w]hen one of [the course of conduct] factors is absent, a stronger

presence of at least one of the other factors is required." USSG § 1B1.3 cmt. n.5(B)(ii). The *Santoro* court failed to square its decision with this instruction.

Importantly too, following *Santoro*'s lead would not be faithful to our precedent. As discussed, when considering the similarity factor, our court has looked beyond the general nature of the offense. When we have upheld relevant-conduct determinations involving illegal gun possessions, we have emphasized characteristics about the possessions that show similarity beyond the act of unlawfully possessing a gun. *See Phillips*, 516 F.3d at 485; *Gales*, 137 F. App'x at 878. And in the analogous context of unlawful drug transactions, we have rejected relevant-conduct determinations when "the sole similarity [was] that both transactions involved the same type of drug." *Hill*, 79 F.3d at 1483. Thus, in line with this precedent, despite an adequate showing of the timing factor, we hold that because the government proved only a single additional non-contemporaneous instance of illegal firearm possession and only minimal similarity between the two possessions, this was insufficient evidence to support a course-of-conduct finding.

IV.

Next, Amerson contends that the district court erred in increasing his offense level based on its obstruction-of-justice finding. *See* USSG § 3C1.1. We review the district court's conclusion about whether the undisputed facts constitute obstruction of justice de novo. *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012); *United States v. Gilpatrick*, 548 F.3d 479, 484 (6th Cir. 2008). The government bears the burden of proving obstruction of justice by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (citing *United States v. Parrott*, 148 F.3d 629, 635 (6th Cir. 1998)). Section 3C1.1 of the Guidelines calls for an increase to the defendant's offense level by two levels if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

USSG § 3C1.1. The application notes provide a non-exhaustive list of examples of conduct captured by the adjustment. *Id.* at cmt. n.4. The conduct includes "threatening, intimidating, or

otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so," and "committing, suborning, or attempting to suborn perjury." *Id.*

Amerson argues that the district court erred in applying the obstruction-of-justice enhancement because his statements (1) constituted no substantial step toward persuading a witness to commit perjury and (2) were not intended to threaten anyone. As to the first contention, he argues that this case is analogous to *United States v. Horn*, where the Tenth Circuit held that the district court clearly erred when it enhanced a sentence for the defendant's obstruction of justice. 113 F. App'x 355, 357 (10th Cir. 2004). In *Horn*, the defendant had written to one of his girlfriends, explaining that his only hope for avoiding a conviction would be if his other friend would say she sold the guns. *Id.* at 356. The Tenth Circuit held that Horn's letter did not rise to the level of trying to influence the testimony of a witness because he took no substantial step toward persuading a witness to commit perjury. *Id.* at 357. The court explained that the letter did not "embark upon" an attempt to obstruct justice because it contained only "a hopeful wish for exoneration and a statement of his future intent to convince [his other friend] to commit perjury." *Id.* Amerson claims that his phone conversations with his girlfriend were similar because they involved only "a hopeful wish that [she] accept responsibility for the rifle." Appellant's Br. at 27.

Amerson's argument is unconvincing. In *Horn*, the defendant expressed to the recipient of his letter a desire (or at most a plan) to persuade another person to claim responsibility for his offense. *See United States v. Huntley*, 530 F. App'x 454, 458 (6th Cir. 2013) (distinguishing *Horn* on grounds that the defendant expressed only a desire to suborn perjury). Amerson contacted the person whom he sought to persuade and *directly asked her* to "claim" his rifle and "let them know" it was hers. By asking her to do so, he did more than describe a potential plan, he enacted it. In fact, Amerson enacted his plan three times. Thus, Amerson took a substantial step toward his goal of having someone else claim responsibility for his offense and the district court did not err in applying the obstruction-of-justice enhancement. *See id.* at 457–58 (upholding imposition of two-level sentencing enhancement for obstruction of justice when defendant spoke directly with a man and tried to persuade him to take responsibility for possession of firearm); *United States v. Bingham*, 81 F.3d 617, 632 (6th Cir. 1996) (upholding

obstruction-of-justice enhancement when defendant told girlfriend "that if she did not testify that a particular gun was hers, he would get into a lot of trouble and he did not want to go back to prison").**4**

## V.

We REVERSE the district court's relevant-conduct finding, AFFIRM its obstruction-of-justice determination, and REMAND for resentencing consistent with this opinion.

---

**4**This conclusion is sufficient for affirming the district court's application of the obstruction-of-justice enhancement. *See Huntley*, 530 F. App'x at 458. For that reason, we decline to address the parties' dispute about whether Amerson's statements about harming Kline support the district court's obstruction-of-justice determination.