Panel rehearing granted by
order filed 9/12/02

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    v.                       No. 00-4359

OVERTON WAYNE PAULEY,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CR-99-48)

Argued: January 25, 2002

Decided: April 22, 2002

Before WIDENER and GREGORY, Circuit Judges, and
Cynthia Holcomb HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Gregory wrote the opinion, in which Judge Widener and Senior
Judge Hall joined.

_____

**COUNSEL**

**ARGUED:** David Robert Bungard, ROBINSON & MCELWEE,
L.L.P., Charleston, West Virginia, for Appellant. John Castle Parr,
Assistant United States Attorney, Huntington, West Virginia, for

Appellee. **ON BRIEF:** Rebecca A. Betts, United States Attorney, Stephanie Taylor, Student Intern, Huntington, West Virginia, for Appellee.

_____

## OPINION

GREGORY, Circuit Judge:

Appellant Overton Wayne Pauley asserts numerous challenges to his sentence of 40 years imprisonment for aiding and abetting possession with intent to distribute methamphetamine and marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. We affirm in all respects but one. Because Pauley's sentence ran afoul of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Cotton*, 261 F.3d 397 (4th Cir. 2001), *cert. granted*, ___ U.S. ___, 122 S. Ct. 803, 151 L. Ed. 2d 689 (2002), we vacate his sentence and remand for resentencing.

I.

Pauley was part of a loose-knit group of individuals, known as the "Garrison Street Crew," that was engaged in distribution of marijuana and methamphetamine in Kanawha County, West Virginia. The crew added to its inventory of drugs for distribution by effecting a string of thefts from other drug dealers. The criminal charges against Pauley stemmed from one of these thefts.

The primary collaborators in the scheme to steal drugs were Pauley and another man named John Hudson, Jr. On May 10, 1998, Pauley and Hudson obtained the assistance of two other men, Shawn Pittman and Rob Parsons, for the purpose of robbing a drug dealer named James Facemeyer at the home of his girlfriend, Carolyn Selbe. The four men drove to Selbe's trailer home in Pauley's Nissan Maxima. Hudson was armed with a .9mm handgun and Parsons was armed with a hammer. Pauley acted as driver and lookout. Pittman also served as a lookout. Wearing masks, Hudson and Parsons kicked down the door and quickly proceeded to the bedroom where they found Facemeyer and Selbe asleep. Brandishing their weapons, Hud-

son and Parsons demanded drugs and money. Facemeyer complied and surrendered two ounces of methamphetamine and four to five pounds of marijuana.

In November 1998, Hudson learned that another drug dealer, Jason Jarrell, was in possession of one-half kilogram of cocaine. Hudson and Pauley drove to Jarrell's home to scout the location. In mid-November, Pauley, Hudson, Rob Parsons, and Steve Hager drove to Jarrell's home to commit the robbery, again using Pauley's Nissan Maxima.[1] The plan, which called for Pauley to approach the house and knock on the door, failed because Pauley was unable to force his way through the door. Later that day, Pauley and Hudson returned with two other individuals, but were unable to commit the robbery because Jarrell came outside with a gun in his waistband. Within a couple of days, Hudson and another man returned to Jarrell's home, broke in, and stole the cocaine. For Pauley's part in scouting and planning the earlier robbery attempt, Hudson sold Pauley an ounce of cocaine at a price below market value.

On December 10, 1998, Pauley was involved in a third drug-related theft. Pauley had earlier learned from Hudson that Christy Alberts and Leonard Watts, also known to deal drugs, had been talking to others about Hudson's role in drug activities which, if those activities became known to law enforcement officers, would implicate not only Hudson, but others who participated, including Pauley. Pauley recruited Lonnie Stuckey to go to the residence of Alberts and Watts to rob them of drugs and money. Hudson provided guns to Pauley for use in the robbery. Pauley and Stuckey were driven to the residence by two female friends. After donning masks, Pauley and Stuckey kicked down the door to Watts' residence. Finding Watts and Alberts in the bedroom, Pauley searched the room for drugs and then ordered Watts and Alberts into the living room. Pauley ordered Watts and Alberts to lie face down on the floor. Although he was wearing a mask, Christy Alberts recognized Pauley, and stated, "I know it's you Wayne, I'm going to get you Wayne, you are going to get in trouble." Pauley shot and killed both Alberts and Watts. He then stole 7.12 grams of methamphetamine.

_____

[1] The record is unclear as to the exact date in November 1998.

On March 15, 1999, Pauley participated in a fourth theft, this time at the residence of a drug dealer named Byrd. Pauley, accompanied by Hudson and two others, drove his Nissan Maxima to the residence. Finding the home unoccupied, all four individuals entered the home. Though they found no drugs, the four did steal eleven firearms from the residence.

Pauley was subsequently arrested and charged in a ten count indictment. He pleaded guilty to count eight, which charged him with aiding and abetting possession with intent to distribute methamphetamine and marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count eight was based on the May 10, 1998 robbery of James Facemeyer. On July 19, 1999, Pauley entered his plea. The remaining counts were dismissed.

At sentencing, the district court found that Pauley was responsible for a quantity of drugs equivalent to 456.25 kilograms of marijuana. The district court then applied the murder cross-reference contained in U.S. Sentencing Guidelines Manual § 2D1.1(d)(1), resulting in a guideline sentence of life imprisonment. Without the cross-reference, Pauley's guideline range would have been 97 to 121 months. The district court applied the murder cross-reference after concluding that the murders were part of the same course of conduct as the offense of conviction or a common scheme or plan. J.A. 377. The district court imposed a sentence of 40 years—the maximum amount of time under 18 U.S.C. § 841(b)(1)(B). Pauley filed a timely appeal.

II.

The district court's findings of fact at sentencing, including those pertaining to relevant conduct, are reviewed for clear error. 18 U.S.C. § 3742; *United States v. Fletcher*, 74 F.3d 49, 55 (4th Cir. 1996); *United States v. Williams*, 977 F.2d 866, 869 (4th Cir. 1992). The district court's legal conclusions are subject to *de novo* review. *United States v. Brock*, 211 F.3d 88, 90 (4th Cir. 2000).

A.

Under the scheme created by the United States Sentencing Guidelines, whether a particular cross-reference should be applied depends

on whether the conduct to which the cross-reference refers is "relevant conduct," defined as follows:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guidelines.

USSG § 1B1.3. The district court found that the murders were relevant conduct under subsection (a)(2).

By its terms, § 1B1.3(a)(2) applies only to offenses to which § 3D1.2(d) would require the grouping of multiple counts. Offenses are grouped together under § 3D1.2(d), *inter alia*,

5

> [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

USSG § 3D1.2(d). Section 3D1.2(d) also lists guidelines to which the section applies. The offense level in drug distribution cases is, of course, determined on the basis of quantity, and § 2D1.1—the guideline containing the murder cross-reference—is specifically listed as a guideline to which § 3D1.2(d) applies. Accordingly, the district court properly looked to § 1B1.3(a)(2) in determining the scope of "relevant conduct."

Under § 1B1.3(a)(2), in sentencing Pauley on one count of aiding and abetting the possession with intent to distribute methamphetamine and marijuana, the district court was required to determine the applicability of the murder cross-reference based on "all acts and omissions committed, aided, [and] abetted" by Pauley "that were part of the same course of conduct or common scheme or plan as the offense of conviction . . . ." Ultimately, then, whether the murder cross-reference should have been applied depends on whether the murders occurred during conduct that was "part of the same course of conduct or common scheme or plan as" the May 10, 1998 drug-related robbery of James Facemeyer. *See* William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L.Rev. 495, 514-15 (1990) ("Relevant Conduct of any one count of conviction that is part of a scheme or course of conduct includes all of the conduct (within the scope of subsection (a)(1) that is part of the scheme or pattern.").

We have set forth a fairly straight-forward test for assessing whether conduct is part of "the same course of conduct or common scheme or plan":

> [T]he sentencing court is to consider such factors as the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern. The significant elements to be evaluated are similarity, regularity and tem-

poral proximity between the offense of conviction and the uncharged conduct. Although an appellate court cannot formulate precise recipes or ratios in which these components must exist in order to find conduct relevant, a district court should look for a stronger presence of at least one of the components if one of the components is not present at all. If the uncharged conduct is both solitary and temporally remote, then there must be a strong showing of substantial similarity.

*United States v. Mullins*, 971 F.2d at 1144 (quotations and citations omitted); *see also United States v. Williams*, 977 F.2d 866, 870 (4th Cir. 1992).

Applying this standard, we find that the string of thefts perpetrated by Pauley and the rest of the Garrison Street Crew to obtain drugs were part of the same course of conduct or common scheme or plan, and hence relevant conduct. Because the murders were committed during the course of one of the thefts, it too is relevant conduct. The thefts occurred in May 1998, November 1998, December 1998, and March 1999. Although the six month time lapse between the May 1998 and November 1998 thefts makes the later thefts somewhat remote, the sheer repetitive nature of the conduct—four thefts in eleven months—tends to support the district court's finding that the thefts were part of the same course of conduct. *See United States v. Hahn*, 960 F.2d 903, 911 (9th Cir. 1992); *United States v. Santiago*, 906 F.2d 867, 873 (2d Cir. 1990). Most important, the thefts were exceedingly similar. Each theft was perpetrated for the purpose of stealing drugs from the residence of another drug dealer. Each of the thefts involved Pauley and Hudson, who recruited others to assist them.[2]

_____

[2] Pauley argues that the various participants differed from theft to theft. Further, he argues that the November 1998 theft should not be considered because he was not directly involved in the actual commission of the theft. We do not think that these differences from theft to theft do much to undermine the district court's findings of similarity. Any differences in how a particular theft actually occurred must be viewed in the context of planning and executing these types of theft. As for the November 1998 theft, Pauley helped scout and plan the theft. Pauley was involved in an initial attempt, but that attempt was aborted. Most impor-

In three of the thefts, the participants were masked and armed.[3] These are precisely the sort of similarities—common victims, common purpose, common accomplices, and similar *modus operandi*—contemplated by the Guidelines. USSG § 1B1.3 app. note 9(A); *Mullins*, 971 F.2d at 1145. The district court's ruling that each of the four drug-related thefts, and consequently the murders of Leonard Watts and Christy Alberts, were relevant conduct for sentencing purposes was not clearly erroneous. Accordingly, application of the murder cross-reference was appropriate.

B.

Pauley argues that the "law of the case doctrine" bars the application of the murder cross-reference. According to Pauley, because the murder cross-reference was not applied to Hudson, it cannot be applied to him. Pauley misunderstands the "law of the case doctrine." The doctrine posits that,

> once the decision of an appellate court establishes the law of the case, it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work a manifest injustice.

*United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting

_____

tant, he shared in the fruits (and, indeed, the goal) of the theft, viz., drugs. Similarly, Hudson was not directly involved in the actual commission of the December 1998 robbery—the one during which Watts and Alberts were murdered—but he provided weapons and informed Pauley that Watts and Alberts were talking about their drug activities. In short, this was Hudson and Pauley's scheme, although the actual participants and the level of their participation varied to some degree—nothing out of the ordinary for such a criminal enterprise.

[3] The record is unclear as to whether the participants in the November 1998 theft were masked or armed.

8

*Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)) (internal quotation marks omitted). The law of the case doctrine is inapplicable here. No appellate court or district court has made any ruling regarding the murder cross-reference in Hudson's case. In actuality, Pauley is complaining about the *absence* of a decision to apply the cross-reference to Hudson, and a perceived resulting unfairness. The law of the case doctrine does not prohibit individualized treatment of defendants. *See United States v. Montgomery*, 262 F.3d 233, 251 (4th Cir. 2001) (holding that "law of the case" does not require government to give co-defendant benefit of stipulation entered into for purposes of defendant's plea); *cf. United States v. Piche*, 981 F.2d 706, 719 (4th Cir. 1992) (holding that sentencing court may not downwardly depart from Sentencing Guidelines in order to eliminate disparate treatment between similarly situated co-conspirators, one of whom was sentenced pursuant to state law conviction). Accordingly, the law of the case doctrine was no bar to the application of the murder cross-reference to Pauley.

C.

Pauley next argues that the district court erred in the amount of drugs attributed to him as relevant conduct. The district court found that the equivalent of 456.25 kilograms of marijuana was attributable to Pauley. Pauley's primary assertion is that drugs taken during the later thefts should not count as relevant conduct. This argument fails for the same reason as his murder cross-reference argument. The later thefts were part of the same course of conduct. Pauley's other assertion is that a large amount of the drugs were for personal use, and therefore should not have been considered in calculating his base offense level. *See United States v. Wyss*, 147 F.3d 631, 632 (7th Cir. 1998); *United States v. Kipp*, 10 F.3d 1463, 1465-66 (9th Cir. 1993). We need not decide today whether drugs possessed for personal use should be considered relevant conduct in sentencing for possession with intent to distribute because the district court's finding that Pauley possessed the entire quantity with intent to distribute was not clearly erroneous. The district court based its determination on the overall amounts stolen during the thefts, the proven purpose of the thefts to obtain drugs for distribution, and the testimony of witnesses, including Hudson, regarding the amount of drugs received by Pauley for

9

distribution. Based on this evidence, the district court did not err in rejecting Pauley's contrary testimony.

D.

Pauley next argues that the district court erred in not reducing his base offense level for acceptance of responsibility. We review a district court's decision to grant or deny an adjustment for acceptance of responsibility for clear error. *United States v. Ruhe*, 191 F.3d 376, 388 (4th Cir. 1999).

Under USSG § 3E1.1, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," he qualifies for a two level reduction in his offense level. "[M]erely pleading guilty is not sufficient to satisfy the criteria for a downward adjustment for acceptance of responsibility." *United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996). Although a defendant is not required to volunteer information, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." USSG § 3E1.1.

Pauley has failed to demonstrate his entitlement to a reduction for acceptance of responsibility. We have today upheld, in the face of Pauley's denials, the district court's determinations regarding the quantity of drugs attributable to him as relevant conduct. Moreover, Pauley has sought to characterize his involvement in the multiple thefts as significantly less than the facts revealed. Finally, he continues to deny his culpability for the execution-style double murder of Leonard Watts and Christy Alberts, asserting that the death of Christy Alberts was the result of an accidental firing, and denying any recollection of the killing of Leonard Watts. This is not acceptance of responsibility. The district court did not err.

E.

We next consider whether Pauley was sentenced in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Because Pauley failed to challenge the indictment or his sentence before the district court,

10

our analysis is governed by Federal Rule of Criminal Procedure 52(b), which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *See United States v. Olano*, 507 U.S. 725, 731-32 (1993). Under *Olano*, Pauley must demonstrate that error occurred, that the error was plain, and that the error affected his substantial rights. *Id.* Even then, "correction of the error remains within our sound discretion, which we should not exercise . . . unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998) (alteration in original) (quoting *Olano*, 507 U.S. at 732).

In this case, the indictment to which Pauley pleaded guilty, charging him with aiding and abetting the possession with intent to distribute methamphetamine and marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, did not specify any threshold quantity of drugs. At sentencing, the district court found Pauley responsible for a quantity of drugs equivalent to 456.25 kg of marijuana, subjecting Pauley to a statutory range—consistent with the plea agreement—of 5 to 40 years. *See* 21 U.S.C. § 841(b)(1)(B). Applying the murder cross-reference, the district court sentenced Pauley to 40 years.

In *United States v. Promise*, 255 F.3d 150, 156 (4th Cir. 2001) (en banc), we held that *Apprendi* mandated that specific threshold drug quantities "be treated as elements of aggravated drug trafficking offenses" and, therefore, charged in the indictment and submitted to the jury. Failure to do so, we held, was plain error. *Id.* at 159-60. The *Promise* court further held that a sentence resulting from the error affects a defendant's substantial rights if the defendant can demonstrate that his sentence exceeded that to which he would have been subject had he been sentenced pursuant to the offense actually charged in the indictment, viz., 20 years pursuant to 21 U.S.C. § 841(b)(1)(C). *Id.* at 160; *United States v. Angle*, 254 F.3d 514, 518 (4th Cir. 2001).

Soon after, we held in *United States v. Cotton* that the error we identified in *Promise* "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" and consequently exercised our discretion to notice the error. *Cotton*, 261 F.3d at 404 (quoting *Olano*, 507 U.S. at 736); *see also United States v. Dinnall*, 269 F.3d

11

418, 422 (2001) (applying *Cotton* in case where the defendant pleaded guilty).

We follow *Apprendi*, *Promise*, and *Cotton* and exercise our discretion to notice the plain error in Pauley's sentence. Pauley received 40 years imprisonment; the maximum sentence he could have received was 20 years. The district court therefore erred in sentencing Pauley to a term of imprisonment in excess of 20 years.

### III.

Accordingly, we vacate and remand for resentencing with instructions to sentence Pauley to a term of imprisonment not to exceed 20 years. Finding no other error, we otherwise affirm.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

12