**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4262**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JUSTICE MCDONALD,

Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:18-cr-00448-WO-1)

Argued:  December 9, 2021                           Decided:  March 21, 2022

Before AGEE and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Diaz and Senior Judge Floyd joined.

**ARGUED:**  Amos Granger Tyndall, AMOS TYNDALL PLLC, Carrboro, North Carolina, for Appellant.  Julie Carol Niemeier, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Matthew G.T. Martin, United States Attorney, Kyle D. Pousson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

AGEE, Circuit Judge:

Justice McDonald challenges his 162-month sentence for possessing with the intent to distribute cocaine base and being a felon in possession of ammunition. On appeal, he asserts the district court committed procedural and substantive error in computing his total offense level and considering the sentencing factors under 18 U.S.C. § 3553(a). For the reasons set forth below, we affirm the judgment of the district court.

## I.

### A.

On January 28, 2019, a federal grand jury returned a superseding indictment against McDonald for possession with the intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count One); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts Three and Four); and felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Five). On McDonald's motion, the district court severed the counts, which originated from three different incidents in 2018, into three trials for evidentiary reasons. The underlying facts giving rise to these counts and their subsequent procedural histories are as follows:

Counts One through Three ("fleeing-on-foot incident")

On February 24, 2018, an officer with the Durham Police Department ("DPD") observed a vehicle with illegal window tint fail to stop at a stop sign in Durham, North

2

Carolina. The officer followed the vehicle to the end of a dead-end street, at which point he activated his emergency lights. The driver of the vehicle, who was later identified as McDonald based on fingerprints obtained from the vehicle, fled the scene, but was soon apprehended.

Upon searching the vehicle, which had been stolen, officers recovered twenty-seven individually wrapped plastic bags containing cocaine base. Using a canine, officers searched the surrounding area and discovered a cell phone, a car key matching the vehicle, and a chambered 9mm Springfield Armory XD-9 firearm, which had a magazine capable of holding more than fifteen rounds of ammunition (sixteen to be exact), thus qualifying as a large capacity magazine under the United States Sentencing Guidelines ("U.S.S.G."). *See* U.S.S.G. § 2K2.1 cmt. n.2. The firearm and car key were recovered five to seven feet from where McDonald was apprehended, but in opposite directions from each other. Despite rainwater on nearby foliage, the firearm was dry, clean, and free from rust. McDonald denied possession of the firearm.

McDonald proceeded to trial on the counts relevant to this conduct, Counts One through Three. The jury convicted him of Count One (possession with intent to distribute cocaine base), but acquitted him of Counts Two (possession of a firearm in furtherance of drug trafficking) and Three (felon in possession of a firearm).

### Count Four ("Taco Bell episode")

On October 14, 2018, officers with the Madison Police Department responded to a call about a suspicious vehicle in a Taco Bell parking lot in Madison, North Carolina and arrived on the scene to find the driver (who was later identified as McDonald's fiancée)

3

and passenger (McDonald) asleep in the vehicle. Upon smelling a strong odor of marijuana when McDonald's fiancée lowered the front windows, officers searched the vehicle and discovered a chambered Glock 23 firearm in the glove compartment that had a large capacity magazine capable of holding twenty-two rounds. After waiving his *Miranda*[1] rights, McDonald claimed ownership of the firearm, which he accurately described to officers, and continued to claim ownership during the subsequent booking process. He also threatened the officers, asserting that if his fiancée had been absent, he would not have cooperated—"[he] would have come out blasting, shooting" at them. J.A. 927.

The Government later successfully moved to dismiss the count relevant to this conduct, Count Four (felon in possession of a firearm), stating "that an additional trial would [not] affect the guideline range or the statutory maximum in a way that would have any meaningful effect." J.A. 493.

### Count Five ("gas station shooting")

On November 3, 2018, DPD officers responded to a report of gunshots at a BP gas station in Durham, North Carolina. Upon arriving at the scene, officers spoke with witnesses and reviewed video surveillance footage, which revealed that a male suspect, who was later identified as McDonald, entered the gas station briefly and then exited with a firearm in hand, at which point unknown individuals fired shots at him. McDonald then returned fire before getting into his vehicle and fleeing the scene. This exchange resulted in damage to nearby vehicles and the gas station.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

McDonald proceeded to trial on the count relevant to this conduct, Count Five (felon in possession of ammunition), and the jury convicted him. He later successfully moved for a new trial on this count because after trial and prior to sentencing, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019), which requires a knowledge-of-felon-status element that was not included at McDonald's trial. At the second trial on Count Five, the jury convicted him.

B.

A Presentence Report ("PSR") was prepared.  The counts of which McDonald was convicted—Counts One (possession with intent to distribute cocaine base) and Five (felon in possession of ammunition)—were grouped together for purposes of calculating his total offense level under § 3D1.2(d) of the Guidelines, meaning "the count with the highest offense level, Count Five, w[as] . . . the offense level for the group." J.A. 1036 ¶ 24 (citing U.S.S.G. § 3D1.3(a)). As such, the PSR attributed McDonald with a base offense level of 22 because his offense involved a semiautomatic firearm capable of accepting a large capacity magazine, and he committed the underlying criminal activity after incurring a felony conviction for a crime of violence (Felony Common Law Robbery under North Carolina law). *See* U.S.S.G. § 2K2.1(a)(3)(A)(i).

The Guidelines provide that this base offense level can be increased based on all "relevant conduct" underlying the offense. *See* U.S.S.G. §§ 1B1.1 cmt. n.1, 1B1.3(a)(2). "Relevant conduct" includes those acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2). Here, the PSR included all three incidents noted above as relevant conduct to McDonald's conviction.

5

Based on the totality of that relevant conduct, the PSR applied a two-level enhancement because McDonald's offense involved three firearms, *see* U.S.S.G. § 2K2.1(b)(1)(A), and a further four-level enhancement because he used or possessed a firearm in connection with another felony offense (Count One (possession with intent to distribute cocaine base)), *see* U.S.S.G. § 2K2.1(b)(6)(B). Pairing his total offense level of 28 with his criminal history category of VI yielded an advisory Guidelines range of 140 to 175 months' imprisonment.

Relevant here, McDonald objected to the base offense level and the two enhancements. He contested whether the three incidents constituted the same course of conduct or a common scheme or plan, namely, the possession of firearms with large capacity magazines. In response, as for the firearm recovered during the fleeing-on-foot incident, the Government highlighted the facts illustrating McDonald's possession, noting that "firearms . . . are valuable objects which are unlikely to be left lying around in the woods, and certainly the condition of that one suggests that it had not been there long." J.A. 944. The Government also called an ATF agent, who testified that this firearm had a magazine capable of holding sixteen rounds.

As for the firearm recovered during the Taco Bell episode, the Government argued that "the way [McDonald] would know the description of that firearm—the make, the model, and the . . . symbol that was on it—would be because he previously possessed that firearm and was, in fact, his gun." *Id.* The Government also referenced further testimony from the ATF agent, who had explained that this firearm had a magazine capable of holding twenty-two rounds. Finally, the Government addressed the firearm used during the gas station shooting, introducing a photograph from the video surveillance footage, which

6

"depict[ed] the magazine extending far below the handgrip." J.A. 945. The Government therefore claimed that McDonald possessed all three firearms, each of which had large capacity magazines, pursuant to the same course of conduct or a common scheme or plan.

McDonald testified at sentencing. He claimed that the firearm recovered during the Taco Bell episode was not his, but rather his fiancée's brother's, and explained that he lied "to protect [his] fiancée from criminal charges because the officers told [him] that she was being charged with that firearm and being taken to jail." J.A. 923. As for the shooting at the gas station, McDonald admitted his involvement, agreeing that he was "the person . . . see[n] on the . . . surveillance video firing the handgun." J.A. 933. However, he claimed that the magazine involved in that shooting was only capable of holding fifteen rounds and therefore was not a large capacity magazine.

The district court overruled McDonald's objections. First, it found that McDonald possessed the firearm recovered during the fleeing-on-foot incident, stating,

> The circumstances of the firearm in total—it was found near where the defendant was apprehended; law enforcement also found an Acura key in that area; the gun was clean, dry, and rust free as reported by the probation officer—all, in my mind, suggest that the defendant did, in fact, possess that firearm and threw the key and the firearm as he was about to be apprehended by law enforcement.

J.A. 952–53. In further support, the court cited the drugs discovered in the vehicle, explaining that the connection between drug distribution and firearms is undeniable.

Similarly, the court found that McDonald possessed the firearm recovered during the Taco Bell episode. In doing so, the court compared McDonald's testimony with the

7

statements he made during the incident, finding his testimony at sentencing was not credible:

> I've seen the video [of the Taco Bell episode], and I've listened to the defendant's testimony; and in all candor, I do not find the defendant's testimony to be credible with respect to this October 14, 2018, transaction. . . .
>
> [L]istening to the defendant's statements on the video, . . . it seems to me to be a very credible assertion that the firearm was his.

J.A. 954. Finally, the court found that McDonald possessed the firearm involved in the gas station shooting. J.A. 956 ("I've seen the videotape, and there's no doubt in my mind that was the defendant discharging a firearm in an extraordinarily dangerous manner with complete disregard to anyone who might be in the direction of his aim and fire, including innocent pedestrians.").

The court then concluded that each of these firearms had a large capacity magazine. As for the firearm used in the gas station shooting, the court referenced the photograph of the video surveillance footage to support its finding:

> I don't have much doubt, looking at the picture, that that was, in fact, an extended magazine,[2] and the defendant's suggestion that that magazine is not capable of holding more than 15 rounds I simply do not find credible, particularly in considering the other two firearms the defendant possessed did hold extended magazines, one of them very similar to the one that's seen in the video.

J.A. 956–57.

The court also determined that the three incidents qualified as relevant conduct:

---

2 The district court referred to an "extended magazine" and "large capacity magazine" interchangeably.

8

[H]ere it seems to me the defendant's multiple possession of firearms throughout 2018—I think we have February 2018, October 2018, and then November 2018—all of those possessions involving the possession of a handgun and, it seems to me, all of those possessions involving an extended magazine, certainly in at least two of those possessions because the handgun and magazine were recovered—but . . . I believe that that Count Five ammunition was also associated with a handgun and an extended magazine to that handgun. . . .

The defendant's continued possession of firearms after having been convicted of a felony throughout the course of 2018 all leads me to the conclusion that these firearms were part of the same course of conduct or common scheme or plan.

J.A. 958–59.

Finally, as for the four-level enhancement for possessing a firearm in connection with another felony offense, the court explained that application of this enhancement was proper because, as noted in the PSR, McDonald possessed a firearm while engaged in the other felony offenses of possession with intent to distribute cocaine base (as charged in Count One). The court further found that this enhancement was proper because McDonald's conduct during the gas station shooting satisfied the elements of assault with a deadly weapon with the intent to kill under North Carolina law.

After addressing the sentencing factors under 18 U.S.C. § 3553(a), the court sentenced McDonald to a within-Guidelines sentence of 162 months' imprisonment, which McDonald timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

9

II.

On appeal, McDonald asserts that the district court committed procedural and substantive error when calculating his total offense level and by neglecting to account for his history and characteristics under § 3553(a). Finding these arguments unpersuasive, we affirm the district court's judgment.

A.

We "review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *United States v. Torres-Reyes*, 952 F.3d 147, 151 (4th Cir. 2020) (alteration omitted) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)).

> First, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."

*United States v. Fowler*, 948 F.3d 663, 668 (4th Cir. 2020) (quoting *Gall*, 552 U.S. at 51). "If [we] 'find no significant procedural error, [we] then consider the substantive reasonableness of the sentence imposed.'"[3] *United States v. Arbaugh*, 951 F.3d 167, 172 (4th Cir. 2020) (alterations and citation omitted). We review the district court's factual

---

[3] McDonald refers to his sentence as procedurally and substantively unreasonable, but his arguments involve "failing to calculate (or improperly calculating) the Guidelines range" and "failing to consider the § 3553(a) factors," both of which we have characterized as inquires implicating procedural reasonableness. *Fowler*, 948 F.3d at 668 (quoting *Gall*, 552 U.S. at 51). Accordingly, we do not address substantive reasonableness.

findings for clear error and its legal conclusions de novo. *United States v. Burnley*, 988 F.3d 184, 187 (4th Cir. 2021).

B.

We begin with the preliminary issue of relevant conduct. McDonald makes two arguments. First, he contends that the district court erred when concluding that he possessed a firearm on each occasion. Second, he posits that the district court erred in finding that each of those three incidents of possession qualified as relevant conduct.

We are convinced that no error occurred in either regard. Sufficient evidence exists in the record to support the district court's finding that McDonald possessed a firearm on each occasion. Moreover, all three incidents were sufficiently connected temporally and involved a regular pattern of similar conduct: illegal possession of like-kind firearms.

1.

The district court concluded that McDonald possessed a firearm during each of the incidents based on a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); *see also United States v. Barber*, 119 F.3d 276, 284 (4th Cir. 1997) ("There is little difference between utilizing uncharged, dismissed, or even acquitted conduct as a basis for departure [from the Guidelines] and employing it as relevant conduct under U.S.S.G. § 1B1.3 to determine the base offense level or adjustments to it. And, the propriety of using uncharged, dismissed, and acquitted conduct for these purposes is well settled." (citing *Watts*, 519 U.S. at 153–

11

57; and then citing *United States v. Carroll*, 3 F.3d 98, 102 n.10 (4th Cir. 1993) (per curiam)). The evidence surrounding the firearms involved supports this finding.

We begin with the gas station shooting because McDonald expressly admitted at sentencing that he was the individual pictured in the video surveillance footage possessing and discharging the firearm. We delve no further to conclude that the district court did not clearly err when determining that he possessed a firearm on this occasion.

Next, as for the fleeing-on-foot incident, the firearm was discovered in a dry, clean, and rust-free state—which is particularly instructive considering it had rained earlier that day—approximately five to seven feet from where McDonald was apprehended and near a cell phone and key to the vehicle he had been driving. Officers also recovered individually packaged cocaine base from the vehicle. Based on the firearm's location, state, and likely connection to the drugs recovered, the district court did not clearly err when finding that McDonald possessed the firearm. *See United States v. Rodriguez*, 94 F. App'x 139, 141 (4th Cir. 2004) (per curiam) (finding the evidence sufficient to demonstrate that the defendant possessed a firearm discovered in the immediate area where officers saw him throw an object while fleeing); *see also United States v. Manigan*, 592 F.3d 621, 629 (4th Cir. 2010) ("[S]o long as a firearm's 'location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapon to the offense conduct.'" (alteration omitted) (quoting *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992))).

12

Finally, during the Taco Bell episode, officers recovered a firearm in the glove compartment of a vehicle in which McDonald was a passenger. He subsequently claimed possession of the firearm, accurately described it to officers, and continued to claim ownership of it during the booking process. Although he later denied ownership at sentencing, the district court found that testimony not credible, relying instead on McDonald's continued assertion of ownership during and right after the episode, as well as his accurate description of the weapon to officers. Based on these facts and the district court's credibility determination, the court did not clearly err when concluding that McDonald possessed this firearm. *See United States v. Moore*, 199 F. App'x 216, 218–19 (4th Cir. 2006) (per curiam) (finding no clear error in imposition of sentencing enhancement after the defendant admitted during arrest that the firearm discovered belonged to him, but later asserted that it belonged to his girlfriend: "The district court impliedly found [the defendant's girlfriend's] testimony [that the firearm belonged to her] less credible than [the defendant's] admission at arrest that the gun belonged to him. Generally, witness credibility is within the sole province of the fact finder, and this court will not reassess the district court's credibility determinations."). We note that this is particularly so because McDonald admitted at sentencing that "had [his fiancée] not been there, [he] would have come out blasting, shooting" at the officers, J.A. 927, a statement incompatible with claiming that he did not possess a firearm.

Based on these facts, the district court did not clearly err when concluding that McDonald possessed a firearm during the three incidents.

13

2.

Satisfied that the district court did not clearly err when assessing McDonald's firearm possession, we consider its related finding on relevant conduct and perceive no error in its determination that the three incidents qualified as such.[4]

As previously noted, the Guidelines called for Counts One and Five to be "grouped together," U.S.S.G. § 3D1.2(d), meaning that Count Five determined McDonald's base offense level because it "produce[d] the highest offense level," *id.* § 3D1.3(b). That offense level could be further increased, however, "on the basis of all 'relevant conduct' in which [McDonald] was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3).

"[W]ith respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," relevant conduct involves "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Relevant here, offenses may qualify as the "same course of conduct" "if they are sufficiently connected or related to each other as to warrant

---

[4] As an initial matter, the parties dispute whether clear error or de novo review is appropriate for this inquiry. *Compare United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014) ("[T]he application of the relevant conduct standard typically involves consideration of factual circumstances, such as whether acts or omissions are sufficiently similar; whether they are sufficiently regular; whether they are sufficiently close in time; and whether, when one factor is particularly weak or even lacking, another factor compensates to satisfy the factual requirements of relevant conduct. Such analysis constitutes factfinding that we review for clear error."), *with United States v. Pineda*, 770 F.3d 313, 319 (4th Cir. 2014) (indicating that the district court's "appli[cation] [of] the incorrect legal rule" would invoke de novo review (quoting *McVey*, 752 F.3d at 610)). We need not resolve this question because we reach the same conclusion whether on clear error or de novo review.

14

the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). That is to say, the same-course-of-conduct standard "requires only 'that the defendant [be] engaged in an identifiable pattern of certain criminal activity.'" *McVey*, 752 F.3d at 611–12 (alteration in original) (quoting *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004)). Relevant factors "include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). "When one of the above factors is absent, a stronger presence of at least one of the other factors is required." *Id.*

Here, we are persuaded that McDonald "engaged in an identifiable pattern of certain criminal activity," *McVey*, 752 F.3d at 612 (quoting *Hodge*, 354 F.3d at 312), meaning the district court did not err when determining that the three incidents qualified as the same course of conduct and, therefore, relevant conduct. We begin with similarity. All three incidents involve similar core conduct in the form of felon-in-possession charges, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Specifically, both the fleeing-on-foot incident and the Taco Bell episode included a felon-in-possession-of-a-firearm charge in Counts Three and Four, respectively, in violation of §§ 922(g)(1) and 924(a)(2). And the gas station shooting resulted in a felon-in-possession-of-ammunition charge in Count Five, also in violation of §§ 922(g)(1) and 924(a)(2). Moreover, each incident involved the same type of weapon (a semi-automatic handgun) with an extended magazine. J.A. 911 (an ATF agent testifying at McDonald's sentencing that, during the fleeing-on-foot incident, McDonald possessed a 9mm Springfield Armory XD-9 handgun with a magazine that held sixteen rounds); J.A. 908–09 (same ATF agent testifying that McDonald possessed a Glock

15

23 handgun with a magazine capacity of twenty-two rounds during the Taco Bell episode); J.A. 938 (McDonald admitting during his testimony at sentencing that he was the individual "holding up a firearm . . . in th[e] picture" from the gas-station shooting and explaining that that firearm's "extended" magazine held up to fifteen rounds). These facts show compelling similarities between the three offenses.

Our decision in *United States v. Hawkins*, 776 F.3d 200 (4th Cir. 2009), *as amended* (Jan. 13, 2015), does not alter this conclusion. There, we determined that joinder under Federal Rule of Criminal Procedure 8(a) was improper where the government failed to demonstrate similarity between "three different offenses: carjacking and possession of a firearm in furtherance of a crime of violence, and . . . being a felon in possession of a different firearm." *Id.* at 208. We reasoned, "While the offenses all involved firearms, albeit different firearms, nothing tie[d] them together except the defendant. There [were] no additional factors which indicate[d] the offenses were 'identical or strikingly similar.'" *Id.* at 209.

*Hawkins* is not analogous here because, at a threshold level, it involved a different standard. While McDonald's case involves relevant conduct and the three factors enumerated above, *Hawkins* dealt with joinder under Rule 8(a), which is specifically based on the similarity of the offenses.[5] *See United States v. Turner*, 925 F.2d 1458, 1991 WL

---

[5] Rule 8(a) provides:
The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

16

18140, at *5 (4th Cir. Feb. 19, 1991), *as amended* (Mar. 11, 1991) (per curiam) ("Because Rule 8(a) and § 1B1.3(a)(2) serve very different ends, it would be overly mechanical and contrary to the intent of the guidelines to interpret the two as coextensive."); *United States v. Santiago*, 906 F.2d 867, 873 (2d Cir. 1990) ("[T]he scope of the Guidelines' 'same course of conduct' [is] broader than that of Rule 8(a)'s joinder principles[.]"). On that point, while we noted the dissimilarity of the three offenses in *Hawkins* as they violated three different statutes,[6] here we observe the similarity of the offenses: three felon-in-possession charges, in violation of §§ 922(g)(1) and 924(a)(2). *Hawkins* implied that such circumstances would support a finding of similarity. 776 F.3d at 208 (distinguishing the joinder deemed proper in *United States v. Rousseau*, 257 F.3d 925, 929 (9th Cir. 2001), which was based on the similarity of the counts at issue: "the defendant [in *Rousseau*] was charged with two counts of violating the *same* statute, 18 U.S.C. § 922(g)(1), although the offenses occurred nearly six and a half months apart and the guns were different").[7] Accordingly, if factored into our analysis, *Hawkins* supports our conclusion on similarity.

Next, for this case, we address regularity and temporal proximity in tandem. We have previously recognized (albeit in unpublished precedent) that "[a] defendant's repeated

---

[6] Hawkins was charged with carjacking, in violation of 18 U.S.C. § 2119; knowingly possessing and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). *Hawkins*, 776 F.3d at 203.

[7] *See also Rousseau*, 257 F.3d at 932 ("The indictment charges Rousseau with one count of being a felon in possession of a firearm on January 26, 1999, and a second count of being a felon in possession of a firearm on August 13, 1999. Clearly, these two offenses were of a same or similar character and therefore were joined properly.").

17

possession of uncharged firearms during a brief period of time supports a 'relevant conduct' enhancement." *United States v. Griggs*, 241 F. App'x 155, 160 (4th Cir. 2007) (per curiam); *see United States v. Spencer*, 748 F. App'x 507, 509 (4th Cir. 2018) (per curiam) ("While in this case there was a four-month gap between the two firearm seizures, the conduct was of identical character: [The defendant] illegally possessed firearms in both instances."). Several of our sister circuits have also persuasively arrived at the same conclusion under similar circumstances. *See, e.g.*, *United States v. Brummett*, 355 F.3d 343, 345 (5th Cir. 2003) (per curiam) (possession of four firearms on three separate occasions within a nine-month period); *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998) (possession of uncharged assault rifle along with two other weapons within a six-to-nine-month period); *United States v. Windle*, 74 F.3d 997, 1000–01 (10th Cir. 1996) (possession of illegal firearms over four-to-five-month period); *United States v. Powell*, 50 F.3d 94, 104 (1st Cir. 1995) ("[N]early contemporaneous[] possession of uncharged firearms is . . . relevant conduct in the context of a felon-in-possession prosecution[.]"); *see also United States v. Phillips*, 516 F.3d 479, 483–84 (6th Cir. 2008) (surveying cases holding similarly).

The events here were both regular and sufficiently connected temporally, as McDonald engaged in a particular pattern of behavior over a limited period of time: three instances of felon-in-possession conduct over the course of nine months (February, October, and November 2018).[8] *See United States v. Pauley*, 289 F.3d 254, 259 (4th Cir.) (finding regularity based on "the sheer repetitive nature of the conduct—four thefts in

---

[8] More specifically, the incidents involve intervals of eight months (between February and October 2018) and one month (between October and November 2018).

18

eleven months"), *modified on other grounds on reh'g*, 304 F.3d 335 (4th Cir. 2002) (per curiam); *McVey*, 752 F.3d at 611–13 (finding sufficient similarity and regularity between possessing child pornography and distributing child pornography to affirm a same-course-of-conduct finding despite the temporal connection spanning from December 2008 to July 2011); *United States v. Amerson*, 886 F.3d 568, 574 (6th Cir. 2018) (explaining that a nine-month window was "sufficient for upholding a course-of-conduct determination involving several illegal firearm possessions").

*United States v. Mullins*, 971 F.2d 1138 (4th Cir. 1992), does not undercut our conclusion on temporal proximity. There, we determined that a six-month interval was insufficient to establish a temporal connection between two unrelated offenses. *Id.* at 1144–45. As an initial matter, six months is not a bright-line cut-off for establishing a sufficient temporal connection in relevant conduct cases. *United States v. Moss*, 430 F. App'x 338, 340 (5th Cir. 2011) (per curiam) ("[T]here is no bright temporal line to cut [prior offenses] off from being counted as relevant conduct[.]"); *United States v. Hill*, 79 F.3d 1477, 1484 (6th Cir. 1996) ("[T]here is no bright-line rule for defining what constitutes 'the same course of conduct or common scheme or plan as the offense of conviction.'"). That is because each relevant-conduct case is fact-specific, reaching different results depending on the circumstances supporting each factor. *See United States v. Correy*, 570 F.3d 373, 392 (1st Cir. 2009) (noting that "the relevant conduct inquiry is 'fact-specific'"). After all, as we recognized in *Mullins*, "an appellate court 'cannot formulate precise recipes or ratios in which these components must exist in order to find conduct relevant.'" 971 F.2d at 1144 (quoting *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir. 1992)).

19

Moreover, the facts in *Mullins* are markedly distinguishable from the circumstances here. In that case, the uncharged conduct was not sufficiently related to the offense of conviction, as the regularity and temporal proximity were "extremely weak." *Id.* In contrast to the three events at issue here, there was only one instance of purported relevant conduct in *Mullins* and that incident "took place over six months prior" to the commission of the offense of conviction. *Id.* We also reasoned that the two offenses were dissimilar:

> The offense of conviction centered on false statements made by Mullins by wire communication to a seller to delay repossession of property that had been provided to [his brother] on the basis of a fraudulent credit application. The uncharged offense conduct involved Mullins' assisting a younger woman to pose as an older woman to obtain life insurance and name [his brother] as the beneficiary.

*Id.* at 1145.

But here, as noted earlier, the facts show the incidents are sufficiently regular, similar, and temporally connected based on McDonald's commission of the felon-in-possession charges—using nearly identical weapons, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)—over the course of nine months. All of these factors are much stronger than in *Mullins* and lead us to conclude that McDonald "engaged in an identifiable pattern of certain criminal activity," which therefore qualified as relevant conduct under the Guidelines. *Hodge*, 354 F.3d at 313.

McDonald nonetheless argues that *United States v. Amerson*, 886 F.3d 568 (6th Cir. 2018), counsels a different result. In that case, the Sixth Circuit reversed a relevant-conduct finding on de novo review. After the defendant pleaded guilty to one count of felon in possession of a firearm based on conduct from August 2016, the PSR recommended two

20

enhancements based on purportedly relevant conduct from May 2016 that involved the illegal possession of a different type of firearm from the offense of conviction. *Id.* at 570, 572–73. Over the defendant's objections, the district court adopted the PSR. *Id.* at 573.

On appeal, the Sixth Circuit considered the same-course-of-conduct factors, starting with regularity, which it concluded was "completely absent" because "the government show[ed] only one other offense[, the May 2016 incident]." *Id.* at 574. As for temporal connection, the court remarked that "a several-month gap between illegal possessions [wa]s not strong enough timing evidence to overcome a complete lack of regularity and prove that the possessions were part of the same course of conduct." *Id.* at 575. Finally, as for similarity, the court noted that "some additional evidence of similarity—something more than the fact that both offenses involved illegal firearm possession—[wa]s necessary to overcome a total lack of another course-of-conduct factor." *Id.* at 577. And although the Government contended that a strong similarity was present because both incidents involved the defendant's illegal firearm possession *during gunfights*, the court concluded that the record simply did not support such a finding. *Id.* at 575–76. As such, the court pointed out that "[t]here were no common victims, common accomplices, common purpose, or similar modus operandi." *Id.* at 577. Thus, the court reversed the relevant-conduct finding because "despite an adequate showing of the timing factor," "the government proved only a single additional non-contemporaneous instance of illegal firearm possession and only minimal similarity between the two possessions." *Id.* at 578.

We find *Amerson* distinguishable, particularly on the issue of similarity. As noted, the *Amerson* court faulted the Government for failing to identify "common victims,

common accomplices, common purpose, or similar modus operandi" between the two handgun possession incidents. *Id.* at 577. But that is not the standard for establishing similarity in a same-course-of-conduct analysis under the Guidelines, which indicate that the factors cited in *Amerson* are relevant to establishing a *common scheme or plan*, not for identifying a *same course of conduct*. U.S.S.G. § 1B1.3 cmt. n.5(B)(i) ("For two or more offenses to constitute part of a *common scheme or plan*, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." (emphasis added)). In *McVey*, we effectively rejected the Sixth Circuit's approach, explaining that "[t]he concept of 'same course of conduct' does not require that acts be connected together by common participants or by a singular overall scheme. Rather, it requires only 'that the defendant [be] engaged in an identifiable pattern of certain criminal activity.'" 752 F.3d at 611–12 (alteration in original) (quoting *Hodge*, 354 F.3d at 312); *see also Windle*, 74 F.3d at 1000–01 (focusing on the defendant's "behavior pattern" when considering the same-course-of-conduct analysis); *Powell*, 50 F.3d at 104 ("The 'same course of conduct' concept looks to whether the defendant repeats the same type of criminal activity over time." (quoting *United States v. Sanders*, 982 F.2d 4, 9 (1st Cir. 1992))). Therefore, we do not find *Amerson* to be in conformity with the Guidelines on this point.

In any event, *Amerson* has limited value because, unlike the circumstances of that case, all three factors relevant to a same-course-of-conduct finding are present here, even if analyzed under that case's framework. As discussed above, unlike the facts in *Amerson*, there is a sufficient showing of similarity in this case, as the offenses were all in violation

22

of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and involved like-kind weapons. These circumstances reveal "characteristics about the possessions that show similarity beyond the act of unlawfully possessing a gun." *Amerson*, 886 F.3d at 578. Moreover, regularity and temporality are met, as the three instances of felon-in-possession conduct (compared to the two in *Amerson*) occurred in February, October, and November of 2018, a nine-month window. *Amerson*, in fact, approved of that same window. *Id.* at 574 ("[T]he gap between Amerson's offenses is well within the nine-month period that we have identified as sufficient for upholding a course-of-conduct determination involving several illegal firearm possessions."). Thus, considering all the factors here, even if we were to apply *Amerson*'s relevant-conduct framework, we would reach the same conclusion.

Accordingly, we hold that the district court did not err when concluding that the three incidents qualified as the same course of conduct and thus relevant conduct for sentencing purposes.[9]

C.

We now turn to McDonald's arguments on the total offense level, which we find unpersuasive.

1.

McDonald first contests his base offense level under U.S.S.G. § 2K2.1(a)(3), which provides for a base offense level of twenty-two if the offense involved a "semiautomatic

---

[9] The Government encourages us to consider another purported similarity between the offenses that the district court relied on—the presence of large capacity magazines, a defined term under the Guidelines, during each of the incidents. We decline to do so, as we are satisfied that a sufficient nexus exists without considering this argument.

23

firearm that is capable of accepting a large capacity magazine . . . and the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." As relevant here, a "semiautomatic firearm that is capable of accepting a large capacity magazine" is one "that has the ability to fire many rounds without reloading because at the time of the offense . . . the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition." U.S.S.G. § 2K2.1 cmt. n.2(A).

Here, McDonald contends that the district court erred by referencing the photograph of the video surveillance footage from the gas station shooting to find that the firearm he utilized had a large capacity magazine.[10] But McDonald's understanding of § 2K2.1(a)(3) is too narrow. The district court was not required to find that the firearm *from the gas station shooting* utilized a large capacity magazine for this base offense level to apply. *See* U.S.S.G. § 2K2.1(a)(3) (referring to "the offense," not the "offense of conviction"). Rather, the court was required to find only that at least one such firearm was present during McDonald's offense *in toto*, which included all instances of relevant conduct. *See* U.S.S.G. § 1B1.1 cmt. n.1(I) (defining "offense" as "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context"); *see also United States v. Bostic*, 168 F.3d 718, 724 (4th Cir. 1999) (rejecting the defendant's objection to an enhancement under § 2K2.1 on the

---

[10] McDonald does not contest the remaining basis for application of this base offense level: "[T]he defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(3).

24

basis that the firearm used to support that enhancement was not part of his offense of conviction because that argument "fails to recognize that [the defendant's] relevant conduct can be considered").

Ignoring the firearm from the gas station shooting, the record demonstrates that two firearms with large capacity magazines were involved in McDonald's offense: the firearm recovered during the fleeing-on-foot incident (the magazine holding sixteen rounds) and the firearm discovered during the Taco Bell episode (the magazine for which held twenty-two rounds). Accordingly, the district court did not clearly err when applying a base offense level of twenty-two.

### 2.

Next, McDonald challenges the three-firearm enhancement he received under U.S.S.G. § 2K2.1(b)(1)(A), which provides for a two-level enhancement "[i]f the offense involved" three to seven firearms. When applying this enhancement, the sentencing court counts "only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed." U.S.S.G. § 2K2.1 cmt. n.5. Based on our foregoing analysis, it is apparent that McDonald's offense involved three firearms. Thus, the district court did not clearly err when applying this enhancement.

### 3.

Finally, McDonald contests the connection-with-another-felony-offense enhancement under U.S.S.G. § 2K2.1(b)(6)(B), which provides for a four-level enhancement "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense." "Another felony offense" includes "any federal,

25

state, or local offense . . . punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 cmt. n.14(C). "The purpose of this enhancement is to ensure that a defendant receives more severe punishment if, in addition to committing a firearms offense within the scope of § 2K2.1, he commits a separate felony offense that is rendered more dangerous by the presence of a firearm[.]" *United States v. Blount*, 337 F.3d 404, 406 (4th Cir. 2003). "Under our precedents, this standard is not especially burdensome: We will find it satisfied when a firearm has 'some purpose or effect with respect to the other offense,' including cases where a firearm is 'present for protection or to embolden the actor.'" *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2020) (quoting *United States v. Jenkins*, 566 F.3d 160, 162 (4th Cir. 2009)).

The district court did not clearly err when applying this enhancement because "in addition to committing a firearms offense within the scope of § 2K2.1 [(Count Five (felon in possession of ammunition))], [McDonald] commit[ed] a separate felony offense [(Count One (possession with intent to distribute))] that [wa]s rendered more dangerous by the presence of a firearm [(the firearm recovered during the fleeing-on-foot incident).]" *Blount*, 337 F.3d at 406. That is to say, the firearm assisted McDonald in facilitating the drug trafficking offense. *Bolden*, 964 F.3d at 287–88 ("[W]e may infer the requisite facilitation from close physical proximity between a firearm and drugs. When the '[o]ther felony offense . . . is drug *trafficking*,' then under Application Note 14(B), a firearm 'found in close physical proximity to drugs' presumptively 'has the potential of facilitating' the trafficking offense[.]" (quoting U.S.S.G. § 2K2.1 cmt. n.14(B)); *see also Jenkins*, 566 F.3d

26

at 163 (explaining that Application Note 14(B) instructs that a gun "found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia . . . necessarily has the potential of facilitating another felony offense" whereas Application Note 14(A) directs the court to "evaluate whether the firearm facilitated, or had the potential of facilitating," a drug possession offense (internal quotation marks omitted)); *United States v. Mansfield*, 560 F.3d 885, 888 (8th Cir. 2009) ("While an underlying drug trafficking offense requires an automatic four-level enhancement of the base offense level, an underlying simple drug possession offense requires the district court to determine first whether the firearm facilitated, or had the potential to facilitate, the underlying drug offense"). Accordingly, we find no error in the application of this enhancement.[11]

## D.

We briefly address McDonald's remaining argument, which is that the district court failed to adequately address the sentencing factors under § 3553(a), namely his history and characteristics as related to his upbringing. The record directly refutes this argument. Indeed, the court engaged in a thorough discussion with McDonald's counsel on this point, remarking:

> [I]t's present in the vast majority of cases, and, that is, I understand the deplorable background circumstances, and they are that. I mean, it's just mind boggling the conditions that some children are born into and grow up in without a doubt; but those conditions, no matter how wrongful[] they may be, have now led to an individual like Mr. McDonald, who persists in possessing a firearm, who has shown he's willing to use that firearm, who has continued to engage in criminal activity—and there comes a point in time

---

[11] It is therefore unnecessary to address the district court's other basis to support this enhancement: assault with a deadly weapon with intent to kill under North Carolina law.

where—I don't mean to suggest that it's too late. . . . [I]t's never too late to save someone. . . .

And so I say all that to say sometimes the lack of the deplorable circumstances of childhood can mitigate and sometimes those same circumstances can suggest that there's an aggravation here. It's likely to take much longer, even if everything goes perfectly, to get to a point where Mr. McDonald is either a—we'll call it a low or acceptable risk within the community.

J.A. 964–65. The court further addressed McDonald's background by explaining:

It does point to a lot of what—that which is described in the presentence report with respect to psychological issues, with respect to substance abuse, with respect to the deplorable conditions in his home life, and in many ways . . . I don't mean anything disrespectful by this, but it's almost as though Mr. McDonald's . . . mentality and his ability to understand that which he is doing has never had any opportunity to mature ultimately except through that which he learned from the United Blood Nation.

Absentee parents, adopted mother dies, adoptive father—I don't criticize him for this—but apparently falls apart after the mother dies—all of these factors in many respects I don't find mitigate the sentence, but I do find that . . . they are reflective of the type of limitations that Mr. McDonald has had with respect to his childhood as well as his early adulthood[.]

J.A. 980–81.

We therefore conclude that the district court properly addressed the sentencing factors when crafting an appropriate sentence for McDonald. Accordingly, we find no procedural error in this regard.

### III.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED.*

28